**William A. JOHNSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 91–CF–5.

District of Columbia Court of Appeals.

Argued Sept. 27, 1995.

Decided Oct. 17, 1996.

---

M. Elizabeth Kent, appointed by this court, Washington, DC, for appellant.

Thomas J. Tourish, Assistant United States Attorney, with whom Jay B. Stephens, United States Attorney at the time the brief was filed, and John R. Fisher, Daniel S. Friedman and Caroline Marnock Carey, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, KING, RUIZ, and REID, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

The issues presented by this case lead us to reexamine the law of this jurisdiction concerning the admission of evidence of crimes other than the crime with which a defendant is charged. Having done so, we reaffirm the longstanding principle set forth in *Drew v. United States* [1] that evidence of another crime is inadmissible to prove disposition to commit the crime charged. At the same time, we continue to recognize that the inadmissibility of such evidence of other crimes may be overcome if it is offered on and determined to be relevant to a material issue in the case. We also reaffirm that the *Drew* rule has application only to evidence of another crime that is independent of the crime charged, and that it does not apply to evidence of acts, including criminal conduct, that directly proves the crime charged. We will follow the policy set forth in Federal Rule of Evidence 403 that evidence, although relevant and otherwise admissible, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, and will apply that policy not only to admission of evidence generally, but also to the decision whether or not to admit evidence of other crimes that qualifies for admission under the exceptions to the *Drew* rule.

## I.

Appellant William A. Johnson was convicted by a jury of premeditated first degree murder while armed (D.C.Code §§ 22–2401, –3202 (1996 Repl.)), conspiracy to distribute and possess with intent to distribute narcotics (D.C.Code § 33–541(a)(1) (1993 Repl. & 1996 Supp.)), possession of a firearm during a crime of violence (D.C.Code § 22–3204(b) (1996 Repl.)), and carrying a pistol without a license (D.C.Code § 22–3204(a) (1996 Repl.)). He appeals his conviction on the grounds that the trial court incorrectly permitted the prosecution to introduce evidence of uncharged crimes, that the prosecution improperly failed to disclose exculpatory material, and that the trial court erred in admitting against him certain statements of a co-conspirator. A majority of a division of this court voted to reverse appellant's conviction on the basis of his other crimes argument without reaching his other points. (Slip op., November 10, 1994). Appellee United States of America petitioned for rehearing or rehearing en banc. The petition for rehearing en banc was granted, and the prior decision and order of the court vacated. We now affirm appellant's convictions.

In this opinion, we concern ourselves primarily with the other crimes evidence issue which split the division. We explain why we are satisfied that the trial court did not abuse its discretion when, having analyzed the issues before it by applying the body of law that has developed concerning "other crimes" or *Drew* evidence, it ruled before trial that the disputed evidence would be admitted. We hold additionally, however, that the evidence was direct proof of the crime charged and admissible as such without regard to any exception to the policy of presumed prejudice and resulting exclusion described in *Drew*. We give the reasons for our conclusion that the trial judge did not abuse his discretion in the manner in which he controlled the development and use of the evidence at trial. Finally, we find unpersuasive the *Brady* [2] and evidentiary arguments Johnson advances.

## II.

The government alleged that appellant Johnson and Bruce Void killed Tyrone Car-

---

1. *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964).

2. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

rington, their partner in a cocaine and phencyclidine (PCP) operation. On the night of September 1, 1989, while he sat in his car in the District, Carrington was shot twice in the head, once from the passenger side of his car with a .38 caliber bullet, and once from the driver's side with a .45 caliber bullet. Minutes before Carrington was killed, he was seen near the scene of the murder driving his car with Johnson in the passenger seat and Void closely following behind in Void's sport utility vehicle.

Whoever shot Carrington inferably stole his portable telephone and key chain, the latter of which held keys for both the car and a nearby Maryland apartment. The apartment doubled as the production center of the narcotics ring and a home for three persons, Carrington's son, Carrington's girlfriend, Crystal Brown, and Brown's younger brother. Minutes after Carrington was shot, calls were placed to the apartment from the portable telephones of both Carrington and Void. Less than an hour after the shooting, following an unforced entry into the apartment, drugs and a nine millimeter pistol were stolen from a rifled bedroom closet (the only place in the home that was ransacked), and the two boys who lived there were shot and killed. The boys, with whom Johnson had played on prior occasions, were ages twelve and thirteen. A week after the killings, appellant and Void were stopped by Maryland police in Void's truck, and the stolen nine millimeter pistol was found in Johnson's possession. The boys were killed by bullets fired from the same .45 that was used to shoot Carrington.

Johnson and Void were charged in a single indictment with the premeditated murder of Carrington, conspiracy to distribute and possess narcotics, and a weapons charge. The indictment alleged, as overt acts in furtherance of the conspiracy, that the defendants had, among other things, robbed the Maryland apartment of drugs, guns, and money, and shot the two boys. Johnson's case was

severed from Void's. Johnson was tried first in response to his speedy trial demand, and was found guilty of the murder, drug distribution conspiracy, and weapon charges. In a subsequent trial, Void was convicted on all counts, and a division of this court affirmed his conviction. *Void v. United States*, 631 A.2d 374 (D.C.1993).

## III.

### A. The Pretrial "Other Crimes" Motion and Ruling

Prior to trial, Johnson moved to bar the government from eliciting evidence of "other crimes," focusing particularly on evidence of the killing of the two boys.[3] The government successfully opposed the motion. At trial, the evidence of the Maryland slayings was admitted.

In moving before trial to exclude the evidence, Johnson urged application of the strictures against "other crimes" evidence laid out in *Drew, supra.* Johnson asserted that the evidence was inadmissible because the government had not established, by clear and convincing evidence, that Johnson was connected with the other crimes, as required under *Drew* and its progeny. Alternatively, appellant argued that the danger of prejudice presented by the admission of the evidence outweighed its probative value and that it should be excluded on that ground.

The government sought admission of the evidence of the Maryland killings under two separate theories. First, the government asserted that, assuming that *Drew* rules were applicable, they were satisfied here because it proposed to use the evidence to prove the identity of the accused, a recognized exception to *Drew.* This was true, argued the government, because the killers of the children and Carrington were almost certainly the same. Supporting this assertion, the government pointed to the significant chronological and evidentiary links between the

---

3. The motion also sought exclusion of evidence of the burglary of the Maryland apartment and related offenses and of illegal possession of a handgun both before and after the murder of Carrington. On appeal, Johnson's counsel advises us that Johnson still takes that position.

Counsel, however, advances no argument concerning the burglary and related offenses. At oral argument counsel concentrated almost entirely on the killings and, accordingly, we do also.

two crimes, the inference that whoever entered the Maryland apartment knew what they would find (knowledge rather uniquely held by Void and Johnson), and the fact that the boys knew Void and Johnson, thus providing the two with a special reason to kill the boys to prevent identification. The government urged that the second prong of *Drew* was satisfied because the danger of prejudice was outweighed by the probative value of the evidence. Also, in response to an argument by co-defendant Void, whose case had not yet been severed, the government insisted that the evidence could not be "sanitized" by, for example, telling the jury only that the same gun that killed Carrington had been used in the apartment, rather than telling them that bullets from that gun were removed from the bodies of the two children.

The government's second argument for admission was that the evidence fell outside the special rules of *Drew* because it was direct proof of the narcotics conspiracy. In this regard, the government relied exclusively upon the argument that the grand jury had listed the Maryland killings as overt acts of the conspiracy, and thus the government had to prove that they occurred. The government did not use as a fallback the argument that the evidence of the Maryland acts was direct proof of Carrington's murder and therefore was admissible even apart from the argument that it proved an overt act of the conspiracy.

The motions court found that the *Drew* requirements were satisfied. It held that, by the proffered evidence, the prosecution had established clearly and convincingly that Johnson committed the uncharged crimes. Evidence that the same person committed both crimes was "powerful," according to the court. The court also ruled that the evidence was admissible regardless of *Drew* because it was directly relevant to the conspiracy, inasmuch as it proved one of the overt acts of the conspiracy. The motions court also found that the probative value of the evidence outweighed its prejudicial effect.

**B. The Threshold *Drew* Ruling was not an Abuse of Discretion**

■ We are satisfied that the trial court did not abuse its discretion in concluding at the pretrial motions stage that the disputed evidence was admissible. The trial court ruled on the assumption that the *Drew* line of cases applied to the issues surrounding evidence of the Maryland crimes. As we will explain, the *Drew* strictures upon admission of other crimes evidence do not apply to evidence directly proving a defendant's guilt. But even assuming that a *Drew* analysis was required in this case, as the trial court for the most part assumed, we would not overturn the trial court's discretionary ruling that the evidence should be admitted.

**1. The *Drew* Rule**

■ If evidence of prior bad acts that are criminal in nature and independent of the crime charged is offered to prove predisposition to commit the charged crime, it is inadmissible. As stated in *Drew*:

> It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose.

118 U.S.App. D.C. 11, 15–16, 331 F.2d 85, 89–90 (emphasis in original; footnotes omitted); *see (James) Jones v. United States,* 477 A.2d 231, 237 (D.C.1984); *Sweet v. United States,* 449 A.2d 315, 318–19 (D.C.1982).

■ Generally, two things must be established to avoid application of the presumption of prejudice that attends other crimes evidence. First, the evidence must be offered for a "substantial, legitimate purpose," including, but not limited to, one of the following issues: (1) motive; (2) intent; (3) absence of mistake or accident; (4) common scheme or plan; or (5) identity. *Drew,* 118 U.S.App. D.C. at 16, 331 F.2d at 90. Second, even if the court determines that such evidence is being offered for a legitimate purpose, the court must additionally consider the relative probative value of the evidence and the danger of unfair prejudice that it poses, and

conclude that the balance favors admission. *German v. United States,* 525 A.2d 596, 607 (D.C.), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987).

If there has not been a final adjudication of guilt as to the other crime, our decisions have also required the prosecution to establish, by clear and convincing evidence, that the other crime occurred and that the defendant committed it. *Groves v. United States,* 564 A.2d 372, 374 (D.C.1989), *modified on other grounds,* 574 A.2d 265 (D.C.1990) (en banc); *see Roper v. United States,* 564 A.2d 726, 731 (D.C.1989). *But see Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (discussed in footnote 18, *infra* ).

## 2. Purpose for Admission other than Predisposition

We have no difficulty concluding that the trial court could reasonably have concluded that the evidence was not offered to prove predisposition to commit the charged homicide. To begin with, the prosecution stated that it was offering the evidence to prove the principal contested issue in the case, identity, and carefully laid out just why this evidence was integral to proof of identity.[4] The very detail of this presentation—it included each of the central facts connecting the two incidents—lent force to the prosecution's assertion that it was not offering the evidence to prove predisposition to commit a crime.[5]

It is possible, of course, to advance a pretextual purpose for admission of evidence which bears "wholly or primarily" on predisposition, *Thompson v. United States,* 546 A.2d 414, 419–20 (D.C.1988), but the record supports the conclusion that the prosecution was not disguising the purpose of the evidence here. In addition, our reading of the record reveals no instance in which the prosecution or its witnesses explicitly or implicitly suggested to the jury that it conclude that the other crimes evidence evinced a predisposition to commit the charged crime.

## 3. The Evidence was Admissible Pursuant to the Identity Exception

We are also satisfied that the trial court could properly have found the evidence to fall within the identity exception. The evidence amounted to a crucial link between Johnson and the killing of Carrington. That the same gun was used in both events closely linked the two. The killing of the two boys so short a time after the Carrington murder was additionally probative of the identity of Carrington's killers because it was more likely that the burglars of the apartment would kill the boys in order to silence them if the boys knew the burglars. Thus, the killing of the boys greatly narrowed the class of persons potentially responsible for Carrington's murder. It is hardly surprising that the government pressed for admission of the evidence, as identity was not merely *a* genuine issue in the case, but the *only* real issue.

## 4. Clear and Convincing Standard Met

Addressing another *Drew* requirement, the trial court had ample support on the record for its conclusion that there was clear and convincing evidence that the Maryland killings in fact occurred and that Johnson was "connected" to them. *See Groves, supra,* 564 A.2d at 374. There was no dispute that the killings in Maryland occurred. Further, Johnson was substantially connected to the killings in several ways: he was seen with Carrington moments before Carrington's cellular phone and keys were stolen; a call was

4. One of the types of other crimes evidence admitted under the identity exception relates to the so-called "signature" crime. In "signature" crime situations, the prosecution must establish that "there are enough points of similarity in the combination of circumstances surrounding the two crimes to create a reasonable probability that the same person committed each." *Groves, supra,* 564 A.2d at 376 (internal quotation marks omitted); *Artis v. United States,* 505 A.2d 52, 56 n. 4 (D.C.), *cert. denied,* 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986); *see Evans v. United*

States, 392 A.2d 1015, 1020–22 (D.C.1978); *Drew, supra,* 118 U.S.App. D.C. at 16 & n. 11, 331 F.2d at 90 & n. 11. In this case the government did not attempt to establish a "signature."

5. For examples of inadequate proffers, *see Campbell v. United States,* 450 A.2d 428, 432 n. 7 (D.C.1982), and *United States v. Bussey,* 139 U.S.App. D.C. 268, 273, 432 F.2d 1330, 1335 (1970).

placed on the phone moments later to the apartment, which was shortly thereafter subjected to an unforced entry; Johnson knew, almost uniquely, what was in the apartment; the boys knew Johnson (thus providing him with a special motive for killing them so as to prevent his identification); and the nine millimeter pistol stolen from the apartment at the time of the killings was both given by Johnson to Brown for safekeeping days before the shootings and found in appellant's possession days later. In short, it would be unreasonable to require more substantial "connections" between Johnson and the Maryland killings.[6]

### 5. Probative Value and Danger of Unfair Prejudice

■ We cannot say that the motions court abused its discretion in finding that the probative value of the evidence exceeded the danger of unfair prejudice.[7] As to probative value, the evidence substantially advanced the prosecution's case. That the .45 was used to kill the two boys in the apartment, less than an hour after Carrington was killed by the same weapon, closely linked the events in a manner that no other evidence did, and thus peculiarly identified appellant and Void as the perpetrators of the D.C. slaying.

■ Two other things connected the two events and thus strongly suggested that Johnson took part in killing Carrington: (1) Carrington's keys to the apartment were missing after he was murdered, and the apartment was entered without force; and (2) the drugs and gun were stolen by some-

one who knew where they were kept in the house, knowledge which arguably belonged only to Johnson, Carrington, and Brown (Carrington's girlfriend). However, as the defense could have argued, the entry of the apartment without force could have been made possible by carelessness in locking the door, and there was even the possibility that the two young boys opened the door to the assailants. In addition, as the defense did argue, people other than Carrington's killers conceivably could have entered the apartment and stolen the drugs and the gun. Thus, the fact of the burglary alone did not provide an unquestionable link between the two events. In contrast, the use of the .45 at both places showed almost incontrovertibly that the two events were connected. The use of the gun on the two boys, since they were especially likely to be able to identify Johnson and Void, both of whom knew the boys and had played with them, further tended to prove that Johnson and Void killed Carrington. Unquestionably, a burglar known to the children would have a greater reason to fear ultimate detection than one who was unknown to them. And a burglar afraid of being linked by the children to a murder would have substantially greater incentive to silence them by (another) murder than an "ordinary" burglar. *See Robinson v. United States*, 623 A.2d 1234, 1239 (D.C. 1993) (motive evidence can help prove identity). In this fashion the record establishes the prosecution's need for the evidence of the Maryland killings, reasonable need being a factor to be considered in the balancing of probative value against prejudice regarding otherwise admissible evidence. *See Easton v. United States*, 533 A.2d 904, 906 (D.C.

6. *Cf. Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc) (requiring only "reasonable possibility" of link between proffered evidence of third-party perpetration of a crime and the crime at issue; relying partly on the "roughly reverse situation" of *Drew* admissibility).

7. In co-defendant Void's case, the same motions judge ruled that although the jury could learn about much of what happened in Maryland, including that the same .45 was fired there, it could not be told that the two boys were murdered. The judge reasoned that since the nine millimeter pistol was found on Johnson but not

on Void, the evidence connecting Void to the apartment was weaker, a consideration in determining the relative probativity of the other crimes evidence. *Void*, 631 A.2d at 381–82 & n. 15. Moreover, Void's defense counsel helped plant the seed of partial exclusion by agreeing to stipulate that the same .45 that allegedly killed Carrington was discharged less than an hour later in Maryland. Thus, while the rulings in *Void* and in the instant matter may appear inconsistent, they were two different cases presented in two different ways, and the judge's treating them differently does not indicate abuse of discretion but rather its careful exercise.

1987).[8] This is not to say that exclusion of the evidence of the boys' murders would be mandated even if the other evidence powerfully implicated Johnson. The factor is "reasonable" need. Juries, in applying the reasonable doubt standard, may demand a showing of a very high probability of guilt, especially when one is accused of first-degree murder.

As to the danger of unfair prejudice, it must be acknowledged that the killing of two innocent boys to keep them from identifying the intruders is worse than deplorable, and the jury would undoubtedly think ill of Johnson if it became satisfied that he did it. We also recognize the danger that a jury might be anxious to blame someone for this heinous act. But it is not likely that the jury used the Maryland crimes as propensity evidence tending to show that Johnson killed Carrington given the unique relationship between the evidence and the lone contested issue, identity. The jury, in a word, would not likely have reached conclusions about Johnson's proclivity for violence before it was satisfied that he was guilty of the charged crime. *Compare Light v. United States*, 360 A.2d 479, 481 (D.C.1976).

Further limiting the danger of unfair prejudice arising from the Maryland killings was the fact that other evidence of wrongdoing—

trafficking in large amounts of narcotics, a shootout earlier on the same day, and the orchestrated "hit" style killing of Carrington by shots to either side of his head—was to be featured prominently as part of the prosecution and the defense cases, thus perhaps making it inevitable that the jury would know from several sources that it was dealing with some very unsavory events.

Finally, we recognize that the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision. *See Light, supra*, 360 A.2d at 481 (broad discretion); *Joy v. Bell Helicopter Textron, Inc.*, 303 U.S.App. D.C., 1, 7, 999 F.2d 549, 555 (1993) (trial court discretion at its height when carrying out this function); *United States v. Long*, 574 F.2d 761, 767 (3d Cir.) (judicial restraint most desirable when reviewing other crimes analysis), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). With the foregoing considerations in mind, we cannot say that the motions court abused its discretion in finding that the probative value of the evidence of the shooting of the boys in Maryland outweighed the danger of unfair prejudice posed by it.[9]

8. On the general topic of the factors to be weighed in concluding whether to admit such evidence, one treatise states:
> In deciding whether the danger of unfair prejudice and the like *substantially outweighs* the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility. John Strong, I McCormick on Evidence § 190 (4th ed.1992). (Emphasis added.)

We add that in reviewing this ruling by the trial court, we are not applying the criterion of *Federal Rule of Evidence 403*, discussed and approved below, that "evidence [otherwise relevant] may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice," but are reviewing it under the test the trial court used. As it passes that test, it necessarily passes the test of FRE 403. It is not necessary to discuss whether our approval of the FRE 403 policy discussed below is retroactive, as

that issue was not briefed and might never be presented to this court.

9. At trial and on appeal, Johnson raised objection to the admission of certain other evidence as other crimes evidence. *See* note 3, *supra*. As Johnson's counsel concedes, the admission of evidence of the burglary of the Maryland apartment and the theft committed there was not an abuse of discretion, as it was highly probative of Johnson's participation in the entire chain of events surrounding Carrington's murder and was not as potentially prejudicial as the evidence of the killing of the boys. The admission of the evidence of Johnson's possession of the nine millimeter handgun six days after Carrington's murder was also highly probative. The gun had been stolen from Brown's apartment during the burglary and that evidence tied Johnson to the burglary. Brown's testimony that several weeks before Carrington's murder she had seen Johnson cleaning a handgun that looked like a photograph of a .38 special Smith and Wesson was not as strongly probative because that particular type of weapon was not used in any of the killings. According to expert testimony, however, a .38 short-barrel Colt was one of the weapons that

### C. It was not Necessary to Apply *Drew* Here

 We have reviewed the motions court's decision to admit the challenged evidence as a *Drew* issue because the government was proposing the evidence under the *Drew* identity exception (save for reference to an overt act of a conspiracy), and the motions court ruled in that context. But, having explained why we find no abuse of discretion in the motions court's *Drew* ruling, we point out that the *Drew* strictures were not applicable here because the evidence of the Maryland murders did not fall within the *Drew* rule at all. Rather, given that the evidence of the Maryland killings was such direct proof of appellant's guilt of the instant charge that the two occurrences could not be said to be independent of one another, *Drew* did not apply.

We recognize that it is debatable whether this legal position was adequately preserved by the prosecution as its argument to the motions court that the Maryland acts were direct proof dealt only with an overt act of the conspiracy which was later withdrawn. *(Azam) Ali v. United States,* 520 A.2d 306, 312 (D.C.1987); *cf. (Tyrone) Johnson v. United States,* 610 A.2d 729, 730–31 (D.C. 1992). But we think it appropriate to discuss the direct proof analysis here both to identify it as an alternative basis for our holding and to clarify an area in which there has been confusion, as this case illustrates, *i.e.,* the distinction between evidence of other crimes that is subject to *Drew* strictures and other evidence which is *not* independent of the crime charged and thus admissible as direct proof of guilt.

Although it may be convenient simply to plug any evidence of uncharged offenses into a *Drew* analysis, it is important to remember that this has never been the appropriate course. To explain why it has not been, we begin with *Drew* itself.

*Drew* involved an assertion of prejudicial joinder. This led the United States Court of Appeals for the D.C. Circuit, then the highest court of this jurisdiction, to consider whether the evidence of one of the two joined offenses could properly have been used to prove the other joined offense, and occasioned the court's focus on the policy against admitting evidence that merely proves disposition to commit crime. *Drew* made it abundantly clear that its prohibition was directed at crimes independent of the crime charged. Thus, the *Drew* court quoted from *McElroy v. United States,* 164 U.S. 76, 79–80, 17 S.Ct. 31, 32–33, 41 L.Ed. 355 (1896), where the Supreme Court noted that the applicable joinder statute did not authorize *"the joinder of distinct felonies, not provable by the same evidence and in no sense resulting from the same series of events."* 118 U.S.App. D.C. at 15, 331 F.2d at 89 (emphasis supplied by *Drew* court). Based on these statements and others, the *Drew* court concluded in relevant part that when "the two crimes arose out of a continuing transaction or the same set of events" the danger of admitting evidence of both in one trial is minimal. 331 F.2d at 90.

In *Miles v. United States,* 374 A.2d 278, 282 (D.C.1977), this court explained the relationship between the uncharged other crime and the charged offense in a case in which joinder was not an issue. There we summarized the *Drew* rule as follows: "Ordinarily, evidence of prior acts which are criminal in nature, whether adjudicated as such or not, *and which are wholly independent of the crime charged,* is inadmissible unless it comes within one of the exceptions listed in *Drew v. United States."* *Id.* at 282 (emphasis supplied); *see (James) Jones, supra,* 477 A.2d at 237.

In *(Abdus–Shahid) Ali v. United States,* 581 A.2d 368, 375 (D.C.1990), *cert. denied,* 502 U.S. 893, 112 S.Ct. 259, 116 L.Ed.2d 213 (1991), after analyzing the relationship between the charged offense and the uncharged crime (possession, several weeks before the charged murder, of a sawed-off shotgun like the one used in the murder), this court held that the evidence of the uncharged crime was relevant to the charged offense "and thus not an independent crime." *Id.* at 376. "Rather," we concluded, the evidence "constituted

could have been used to shoot Carrington and, to a person not familiar with handguns, it would look similar to the .38 Smith and Wesson. This

evidence was sufficiently probative to warrant our deferring to the motions court's decision to admit it.

evidence of the crime charged" and was thus admissible. *Id.* at 377. Our holding in *(Abdus–Shahid) Ali* was consistent with the principle that "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." *Coleman v. United States,* 379 A.2d 710, 712 (D.C.1977).

We later stated unequivocally in *King v. United States,* 618 A.2d 727, 730 (D.C.1993):

> Our cases have repeatedly held that admissibility of this kind of evidence [possession of pistol allegedly used in assault with intent to kill] is based upon a determination of whether it was directly relevant to some issue in the case. We have never held, and do not do so now, that such evidence must meet the standards established by the *Drew* line of cases. (Citation omitted).

*See generally* EDWARD IMWINKELREID, UNCHARGED MISCONDUCT EVIDENCE ("IMWINKELREID") §§ 6.03–.13 (1994). Thus, in *Sweet v. United States,* 449 A.2d 315, 319 (D.C.1982), we held that the *Drew* strictures were not applicable where the defendant's inculpatory statements to the victim, to the effect that he had killed or raped other persons, were offered solely to establish the mental state of the victim of the rape.

In *Thomas v. United States,* 588 A.2d 272 (D.C.1991), the defendant was charged with maintaining a bawdy or disorderly house in violation of D.C.Code § 22–2722 (1989 Repl.). The house was the subject of a stakeout between July 16th and 17th, but the defendant was not arrested until ten days later. The defendant claimed that evidence gathered during the stakeout was "other crimes" evidence that was presumptively inadmissi-

ble. The court, however, noted that the government had to prove regular use of the house for illegal or immoral acts, and evidence of events of the two earlier days was needed to show regularity of improper use. It added:

> *Drew* evidence is evidence of *another* crime independent of the crime charged. The evidence from July 16–17 and 28 was not admitted as evidence of another, independent crime. Thus, it was not even arguably admitted for the improper purpose of proving appellant's bad character or disposition to commit crimes.

*Id.* at 274 (citation omitted; emphasis in original); *see (Abdus–Shahid) Ali, supra.*

 Likewise, in *Lee v. United States,* 471 A.2d 683, 686 (D.C.1984), where one accused of rape while armed with a knife complained of evidence that he had carried a knife in his car, the court noted that a limiting instruction regarding propensity is not necessary "when evidence of one crime is inextricably *intertwined* with the evidence necessary to the proof that he committed the crime charged." *See (James) Johnson v. United States,* 596 A.2d 980 (D.C.1991).[10]

The *Lee* statement of the "inextricably intertwined" rule was rooted in *Smith v. United States,* 312 A.2d 781 (D.C.1973). In *Smith,* one of the first post-*Drew* cases dealing with threats to witnesses by defendants, the evidence of the threat was held not to be controlled by *Drew* because it was "an admission, directly relevant to guilt, [and] is entwined with other evidence, a threat, such other evidence tending to prove another, but unrelated criminal act, obstruction of justice." 312 A.2d at 785; *see Edward Ford v. United States,* 647 A.2d 1181, 1185 (D.C. 1994) (post-crime conduct—failure to appear

---

**10.** If evidence is within the *Drew* rule, the trial court must generally give a limiting instruction, as it did here. *See, e.g., Jones v. United States,* 477 A.2d 231, 243 (D.C.1984) (trial court has general duty to instruct *sua sponte* on limited purpose for which other crimes evidence is admitted, but failure to do so is not necessarily reversible error). Conversely, where evidence not within *Drew* indicates that a defendant engaged in criminal conduct other than the offense charged, as in *Lee, supra,* an instruction is not always required. Nonetheless, given the possibility that a juror might make improper use of

non-*Drew* evidence indicating such criminal conduct, the trial judge must exercise sound discretion in passing upon a request for a cautionary instruction that would limit the jury's consideration of that evidence to its proper purpose. *See Thompson, supra,* 546 A.2d at 425–26 (courts assume that well drawn and effectively delivered jury instructions reduce, if not dissipate danger of unfairness and prejudice). Where the other criminal conduct is as serious as that involved in this case, the sound exercise of discretion would almost invariably result in granting a request for an instruction.

for trial—relevant to show consciousness of guilt); *see also Wages v. United States,* 594 A.2d 1053, 1055 (D.C.1991) (leaving undecided whether defendant's attempt to bribe witness was "other crimes evidence—rather [than] circumstantial evidence of the crime charged").

A related situation not governed by *Drew* arises when evidence is offered "to explain the immediate circumstances surrounding the offense charged." *Green v. United States,* 440 A.2d 1005, 1007 (D.C.1982) (evidence necessary to "complete the story"); *see Campbell v. United States,* 450 A.2d 428, 430 n. 4 (D.C.1982) (same); *Wooten v. United States,* 285 A.2d 308, 309–10 (D.C.1971) (evidence of uncharged offense is admissible to explain circumstances of charged offense). In those instances, we are dealing with "'events so closely related to the charged offense in time and place that they are necessary to complete the story of the crime ... by placing it in context of nearby and nearly contemporaneous happenings.'" *Holmes v. United States,* 580 A.2d 1259, 1266 (D.C. 1990) (quoting *Williams v. United States,* 549 A.2d 328, 333 (D.C.1988)); *Toliver v. United States,* 468 A.2d 958, 961 (D.C.1983).

 From the foregoing, it is clear that *Drew*'s strictures do not come into play in every instance in which evidence offered to prove guilt of the charged offense could be offered in support of a prosecution of another crime. Specifically, *Drew* does not apply where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context.

In this case then, the evidence of the Maryland murders was admissible quite apart from any *Drew* exception. The Maryland murders were not independent because the same evidentiary stream ran through them and the charged crime. The same gun was used in both, they occurred close to one another in time—the second occurring in

part arguably as a consequence of the first— and they tend to prove one another, for the cogent reason (among others) that the perpetrators of each were known to the two Maryland victims, and for that reason killed them. Thus, the evidence of the Maryland offenses falls into the first of the non-*Drew* categories described above—direct and substantial proof of Johnson's guilt of Carrington's murder.[11] The *Drew* presumption against admission of true "other crimes" evidence was not applicable here.

### D. The Balancing Test in General

This case demonstrates the importance of the balancing of probative value against the potential for unfair prejudice that trial judges must perform whenever relevant evidence poses a danger of unfair prejudice. When the *Drew* rule applies but the proffered evidence falls within one of its exceptions, just as in this case of direct proof not subject to *Drew,* the trial court must weigh the apparent probative value of the evidence against the unfairly prejudicial effect that it is likely to have, and thereby determine whether to admit it.

In close cases, at least, that determination may be controlled by whether (1) admission is appropriate only where probative value exceeds prejudicial impact or, conversely, (2) admission should be permitted unless prejudicial impact exceeds (or substantially exceeds) probative value. The difference is not merely semantic, as it may spell the difference between admission and exclusion; indeed, the choice we make says much about our system's confidence in juries and hence its receptivity to evidence that is conceded to be relevant. *Cf. Winfield, supra,* 676 A.2d at 7.

 In cases where *Drew* is applicable, we have stated the rule both ways. *See, e.g., Campbell, supra,* 450 A.2d at 430; *Jones v. United States,* 477 A.2d 231, 237 (D.C.1984). In cases not subject to *Drew,* there has also

---

**11.** We note that the evidence of the Maryland murders bears an immediate relationship to the charged offenses, both temporally and causally, that is especially strong—stronger, for example,

than the prior possession of a weapon similar to the murder weapon in *(Abdus–Shahid) Ali, supra.* This circumstance weighs heavily in the balance against prejudice.

been a lack of consistency.[12] We think it important that the rule be stated clearly. Therefore, we take this opportunity to clarify that, regarding the admission of evidence generally, this jurisdiction will follow the policy set forth in Federal Rule of Evidence 403—"evidence [otherwise relevant] may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ,"[13] and will apply that policy in the other crimes context as well. We will discuss briefly the considerations that have led us to these conclusions.

Several of our opinions have cited FRE 403 as authoritative. *See, e.g., Reed v. United States,* 584 A.2d 585, 591 (D.C.1990); *Lampkins v. United States,* 401 A.2d 966, 970 & n. 9 (D.C.1979). Thus, a treatise could state that FRE 403 is consistent with practice in the District of Columbia. STEFFEN GRAAE & BRIAN FITZPATRICK, THE LAW OF EVIDENCE IN THE DISTRICT OF COLUMBIA iv–12 (1995); *see also Report of the Committee on Court Rules of Division IV of the District of Columbia Bar Proposing Rules of Evidence for the Superior Court Based on the Federal Rules of Evidence,* Comment to Rule 403 (Feb. 2, 1984). Most significantly, however, this court relied upon Rule 403 in affirming a trial court ruling excluding certain evidence because its "probative value . . . was substantially outweighed by danger of [prejudice]." *Reed, supra,* 584 A.2d at 591. While in *Reed* the trial court apparently had not expressed the outcome of its consideration of the proposed evidence in those terms, this court

inferred from the trial court's explanation of its ruling that it had found that prejudice substantially outweighed probative value. *Id.* at 587 n. 1, 591.

Because we announce that we will follow FRE 403, we should take note of its requirement that the danger of unfair prejudice *substantially* outweigh probative value before relevant evidence may be excluded. While the commentary to the Federal Rules of Evidence and the legislative history of the rules are quite extensive, they do not discuss why the word "substantially" was used. *See* GREGORY JOSEPH & STEPHEN SALTZBURG, EVIDENCE IN AMERICA—THE FEDERAL RULES IN THE STATES § 13.3 at 5 (1987). The "substantially outweighs" approach is apparently the product of the general federal policy promoting the admission of as much relevant evidence as reasonably possible. *See Huddleston v. United States,* 485 U.S. 681, 688–89, 108 S.Ct. 1496, 1500–01, 99 L.Ed.2d 771 (1988); JACK WEINSTEIN, MARGARET BERGER & JOSEPH MCLAUGHLIN, WEINSTEIN'S EVIDENCE ("WEINSTEIN'S EVIDENCE"), Preface at xvi (1995 ed.); CLIFFORD FISHMAN, 2 JONES ON EVIDENCE § 11:10 (7th ed.1994); *see also Laumer v. United States,* 409 A.2d 190, 195 (D.C.1979) (en banc).

Federal Rule of Evidence 403, or at least its requirement that the danger of unfair or undue prejudice "substantially" outweigh probative value, has been adopted by at least forty of the states.[14] Only Alaska, which

---

**12.** In cases *not* involving *Drew* issues this court has said at various times that probative value must outweigh prejudice in order to permit admission, *see, e.g., Pittman v. United States,* 375 A.2d 16, 19 (D.C.1977), and that the converse was true. *See, e.g., Smith v. Executive Club, Ltd.,* 458 A.2d 32, 40 (D.C.1983); *Williamson v. United States,* 445 A.2d 975, 981 (D.C.1982). See also the opinions of the D.C. Circuit in *United States v. Marcey,* 142 U.S.App. D.C. 253, 256, 440 F.2d 281 (1971), and *United States v. Kearney,* 136 U.S.App. D.C. 328, 332, 420 F.2d 170 (1969).

**13.** FEDERAL RULE OF EVIDENCE 403 provides in its entirety:

**Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,

or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**14.** WEINSTEIN'S EVIDENCE, 403: 91–103; ALA.R.EVID. 403; ARIZ.R.EVID. 403; ARK.R.EVID. 403; CAL.EVID. CODE § 352; COLO.R.EVID. 403; DEL.R.EVID. 403; FLA.STAT.ANN. § 90.403; HAW.R.EVID. 403; IDAHO R.EVID. 403; IND.R.EVID. 403; IOWA R.EVID. 403; KY.R. EVID. 403; LA.R.EVID. 403; MD.R. 5–403; ME.R.EVID. 403; MICH.R.EVID. 403; MINN.R.EVID. 403; MISS.R.EVID. 403; MONT.R.EVID. 403; NEB. REV.STAT. § 27–403; N.H. R. EVID. 403; N.J.R.EVID. 403; N.M.R.EVID. 11–403; NEV.REV.STAT. § 48.035(1); N.C.R.EVID. 403; N.D.R.EVID. 403; OHIO R.EVID. 403; 12 OKL.ST.ANN. § 2403; OR. R.EVID. 403; R.I.R.EVID. 403; S.C.R.EVID. 403; S.D.COMP.LAWS ANN. § 19–12–3; TENN.R.EVID. 403; TEX.R.CRIM.EVID. 403; UTAH R.EVID. 403; VT.R.EVID. 403; WASH.R.EVID. 403; W.VA.R.EVID. 403; WIS. STAT.ANN. § 904.03; and WYO.R.EVID. 403; *see* P.R.

otherwise wholly adopted FRE 403, chose not to include the qualifier "substantially." [15] While it has been suggested that the import of adding the word "substantially" may not be great,[16] it is reasonable to anticipate that trial judges will exercise their discretion to admit such evidence in some instances in which they otherwise might not do so. *Cf. Allen v. United States,* 603 A.2d 1219, 1224 (D.C.) (en banc), *cert. denied* 505 U.S. 1227, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992) ("Probative evidence should not be excluded because of crabbed notions of relevance or excessive mistrust of juries.") (quoting *Riordan v. Kempiners,* 831 F.2d 690, 698 (7th Cir. 1987)).

Having considered the matter, we have determined to use the formulation set forth in FRE 403, including the word "substantially," in connection with the admission of evidence generally when it is challenged as "unfairly prejudicial." Our doing so will further the policy of admitting as much relevant evidence as it is reasonable and fair to include, and will also gain for this jurisdiction the advantage that uniformity with the feder-

al rule and the vast majority of state rules affords for interpretation and application.

■■■■■ We conclude that we should also follow that same policy regarding evidence that is subject to a *Drew* analysis but qualifies for admission under any of the exceptions to *Drew.* We recognize that the prevailing view at common law was that the proponent of such evidence had the burden of persuading the trial judge that on balance the probative value outweighed unfair prejudice. *See* IMWINKELREID, *supra,* § 8:27. Since the adoption of FRE 403 and FRE 404(b),[17] however, the balancing procedure in federal courts has evolved. The Supreme Court settled the question decisively for federal courts in *Huddleston, supra,* 485 U.S. at 681, 108 S.Ct. at 1406–97, when it used the FRE 403 requirement that probative value be "substantially outweighed" by the danger of unfair prejudice in its analysis of an issue arising under FRE 404(b) involving other crimes. *Id.* at 687, 691, 108 S.Ct. at 1500, 1502;[18] *see* JOHN STRONG, I MCCORMICK ON EVIDENCE § 190, at 811 (4th ed.1992).

R. EVID. 19; N.Y.CODE EVID. (Proposed 1991) § 403; MIL.R.EVID. 403; *see also* UNIF.R.EVID. 403.

**15.** *See* Commentary to ALASKA R.EVID. 403, quoted in WEINSTEIN'S EVIDENCE, 403: 96–97.

**16.** One commentator has observed that "it is not readily apparent that Alaska's omission of 'substantially' has had any practical impact." EVIDENCE IN AMERICA, *supra,* § 13.3 at 5; *see* Andrew Dolan, *Rule 403: The Prejudice Rule in Evidence,* 49 So.CAL.L.REV. 220, 236 (1976).

**17.** FRE 404(b) provides in pertinent part:
(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....
The quoted language of FRE 404(b) is consistent with District of Columbia law. We observe that we are not adopting in this case the policy of requiring the prosecutor to give advance notice of intent to use other crimes evidence which was included in FRE 404(b) by amendment in 1991. But we also observe that even without a rule or policy requiring such notice, the trial court has the discretion to require parties to disclose in advance their intention to use evidence of other crimes, and in any event a prosecutor may find it

prudent to afford such notice. Such notice may obviate any possible claim of unfair surprise and may avoid a request for continuance. *See Ford v. United States,* 647 A.2d 1181 (D.C.1994), and separate statement of Farrell, J., *id.* at 1186.

**18.** The Supreme Court held unanimously in *Huddleston* that a trial court need not make a preliminary finding that the government had proved by a preponderance of the evidence or by clear and convincing evidence that the defendant had committed the other bad act or crime in question. Instead, the Supreme Court held that similar acts evidence should be admitted, subject to a probative/prejudicial balancing, "if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." *Huddleston, supra,* 485 U.S. at 685, 108 S.Ct. at 1499. As we have stated, the motions judge in this case found, as a preliminary matter, that the government had established by clear and convincing evidence that the other bad acts had occurred and that Johnson had committed them. Johnson argues on appeal that the record did not support that finding. We disagree.

We do not determine here whether the above-described holding of *Huddleston* should be followed in this jurisdiction, *cf. Daniels v. United States,* 613 A.2d 342, 349 (D.C.1992) (concurring opinion), as we agree with the motions judge's finding that the government had satisfied the more demanding clear and convincing standard.

In summary on this point, then: if other crimes evidence is offered to prove propensity to commit an offense, it is inadmissible. If other crimes evidence subject to a *Drew* analysis is offered, it may be admitted only if it qualifies for an exception to the *Drew* rule restricting its use. We reiterate that, when evidence is correctly analyzed as coming within *Drew's* purview, "the prosecutor has the burden of showing that the evidence falls within one or more of the recognized exceptions." *Thompson, supra,* 546 A.2d at 424 n. 18. Furthermore, we do not consider here, and therefore leave intact, the requirement that evidence that defendant committed the other crime in question must be established preliminarily by clear and convincing evidence. See note 18, *supra.* Even if the evidence so qualifies, the trial judge should [19] still exclude it if the danger of unfair prejudice that it poses substantially outweighs its probative value. In identifying the preferable approach to the admission of such evidence under FRE 403, we are in accord with the following statement by the United States Court of Appeals for the Ninth Circuit: "The government must carry the burden of showing how the proffered [other crimes] evidence is relevant to one or more issues in the case, and must demonstrate that, on balance, its probative value is not substantially outweighed by the danger of unfair prejudice to the defendant." *United States v. Conners,* 825 F.2d 1384, 1390 (9th Cir.1987) (citation omitted). On the other hand, if relevant evidence could theoretically support additional charges but is not subject to *Drew* analysis because the other crimes are not independent of the crime charged and the evidence is direct proof of the crime charged, it must surmount only the final hurdle that all evidence of whatever sort must clear, i.e., the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice it poses. In all instances, the proponent of the evidence must satisfy the court that it should be admitted.

### E. References to "Other Crimes" Evidence at Trial

At trial before Judge McIntyre, Johnson did not ask the court to reconsider Judge Eilperin's ruling on the pretrial motion to bar the government from using the evidence of the killings and other activity in Maryland shortly after Carrington's murder, and evidence relating to Johnson's possession of handguns before and after that murder. Although the government abandoned all three killings as overt acts of the alleged drug distribution conspiracy, Johnson did not then ask the trial judge to reconsider the pretrial ruling that evidence of the Maryland killings was admissible as direct proof of Johnson's guilt of the murder of Carrington. Indeed, the trial judge essentially stated in colloquy over a limiting instruction that the use of the same weapon was direct proof of guilt. In reviewing what transpired at trial, we will consider whether the manner in which the government used that evidence at trial was unfairly prejudicial, as Johnson's counsel asserted at oral argument.[20] Ultimately, on the assumption (fully borne out at trial) that the trial judge recognized the danger that relevant evidence might assume unfairly prejudicial form, our inquiry is whether the trial judge abused his discretion in failing to control the development and use of the evidence at trial.

At trial, Johnson's trial counsel did not object to the manner in which the prosecutor used the evidence of the Maryland occurrences in conducting the examination of witnesses or making opening and closing statements. Nevertheless, the trial judge played a commendable role in keeping control of the presentation and thus minimizing any unfair prejudice that this evidence might have produced. The prosecution undertook to prove by circumstantial evidence that Johnson and his severed accomplice, Void, had killed Carrington. Virtually unassailable was the proof that Johnson, Void, and Car-

---

19. FRE 403 uses the language "may be excluded," but we use "should" in our formulation here in order to inform the trial court's exercise of discretion in a *Drew* situation.

20. Even where other crimes evidence may properly be found to be admissible, we may be called upon to determine whether there was error as a result of its manner of presentation. *See Hill v. United States,* 600 A.2d 58 (D.C.1991).

rington were partners in the sale of narcotics, and that Johnson was riding with Carrington, immediately followed by Void, a few minutes prior to Carrington's death. While the foregoing alone powerfully indicated that Johnson had a hand in killing Carrington, reasonable minds could find doubt as to the charge of murder if that were the only evidence supporting that charge. By showing that what occurred after the murder of Carrington was in all likelihood committed by persons who both knew the inner workings of the drug operation, and had a special reason to kill the boys, the prosecution sought to prove convincingly that Johnson killed Carrington.[21]

In its opening statement, the prosecution did not suggest that the Maryland killings demonstrated appellant's propensity to commit the charged offense. The statement contained only three significant mentions of the Maryland killings. The first two were references to the fact of the shootings and the familial relationship of the two boys and a description of the Maryland murder scene. They were relatively brief, and were dry rather than dramatic. Perhaps the most vivid language employed by the prosecution was a reference to all three shootings on the night in question as "a terrible thing."

The third statement, which came as the prosecutor explained the reaction of Brown as she came home to find the two boys shot, warrants a closer look:

> And in her apartment, I believe her testimony is, she heard a moaning sound, she discovered that the two boys were shot ... her boyfriend's son and her little brother. She went into her room and she found everything pulled out of her closet. And the police's [sic] testimony and her testimony will show you it was pulled out down to a spot and laying there was the

papers for the gun. The gun was gone and the papers were there.

While the use of the word "moaning" was unnecessary, we note that it was one isolated word in the course of a detailed statement. Further, trial counsel did not object to this reference, either during the opening statement or later at the bench. We are satisfied from our reading of the record that there was nothing significantly objectionable or inflammatory about the opening statement's treatment of the Maryland killings.

Nor did the prosecutor focus unduly on the evidence of the Maryland murders during the presentation of its case, which included the testimony of twenty-eight witnesses. It is true that the prosecutor did elicit the fact of the Maryland killings from its first witness. But that witness, Brown, testified over two days and laid out in critical detail the background of the narcotics conspiracy, which was essential to understanding both that charge and linkages between Johnson and Carrington's murder. As part of Brown's chronological relation of events, as she described how she arrived home to discover the door to her apartment unlocked, she stated matter-of-factly that when she looked in the boys' room she found that each had been shot in the head.

Surely, this testimony had some impact, but we note that Brown's answers appear to reflect, if anything, a cautious word from the prosecutor to avoid being too emotional. We cannot find that the foregoing was unfairly inflammatory. And while the questioning returned briefly to the deaths of the boys at the close of Brown's direct testimony, those questions were simple and did not produce emotional answers.

As to references to the Maryland killings by other witnesses, we note that they too were purely factual and do not appear to

---

21. It was the prosecutor who first suggested the need for a limiting instruction regarding the evidence admitted under a *Drew* exception. The court insisted that defense counsel draft the instruction with specificity, noting, "I don't want to tell that jury something that would harm your client." Thus, while it can be argued that the instruction should have explicitly told the jury not to use the evidence as proof of propensity, instead of telling the jury that it could use the evidence only on the issue of identity, we cannot say the court erred in instructing in accordance with the request of the defense. *See (George) Jones v. United States*, 625 A.2d 281, 285 (D.C. 1993) (limiting instructions risk emphasizing improper matters, such that defense may not want them). Further, defense counsel asked the court to include the same instruction in its final charge, and the court largely did so.

have been fashioned to suggest propensity. A person who lived next to the Maryland apartment related in a straightforward manner what he heard through the wall (shots and later screams), and crucially related the timing of these events. The testimony of the Maryland detective, who might have been asked to describe a grisly scene, focused largely on the bedroom closet that had been ransacked (presumably by Carrington's killers) and the identity of the nine millimeter pistol that was inferably stolen from the apartment and later found in Johnson's possession. Her testimony as to the death of the two boys was dryly factual, and consumed only a page of transcript. Indeed, the killings were not even mentioned during redirect examination of this witness. Nor was unduly graphic testimony provided by those charged with gathering evidence and photographing the scene.

In contrast to the prosecution's caution, we note that defense counsel waded right into the evidence of the Maryland killings. Of course, that Johnson chose to use this evidence did not amount to. a waiver of his earlier objection to the admission of any other crimes evidence. *(Charles) Jones v. United States*, 385 A.2d 750, 752 (D.C.1978). Nonetheless, Johnson's use of this evidence goes directly to whether reversal is required by the *manner* in which the evidence was presented. *See Miles, supra*, 374 A.2d at 283 (no error where the defense "made a conscious tactical decision to air fully the evidence"); *see also Parker v. United States*, 586 A.2d 720, 725 (D.C.1991).

An early example of the defense's use of this evidence came during the cross examination of the Maryland detective who described the scene in the apartment. Defense counsel questioned her concerning signs of *rigor mortis* in one of the boy's bodies, including signs of "rigidity in the face." And, when the deputy medical examiner who performed the autopsy on Carrington's body testified, defense counsel did not hesitate to engage him in an anatomically detailed discussion of the paths of the bullets and just which part of the head braked a particular bullet. When cross-examining yet another evidence technician, defense counsel focused on the question

of just how much blood was on the bullet that passed through the brain of one of the boys, and the question of whether it had been cleaned. Defense counsel's lack of squeamishness was also exhibited by three questions he put to a ballistics expert in near-succession:

Q. Now, if it was a .45 caliber weapon and I was shot [in the head from a short distance away], how far would the bullet travel after it had gone through my head?

* * * * * *

Q. Okay. Well, let me ask you this. Do you know this. Do you know if a bullet goes through somebody's head, does it generally have blood on it when it comes out the other side?

* * * * * *

Q. So would it also be beyond your expertise to say whether a bullet that goes through somebody's head and through the portion of the head where the brain is located, would [it] also be beyond your expertise to say whether you would expect to find brain tissue on that bullet; is that correct?

The defense also declined to enter stipulations that might have kept some of the more clinical testimony from coming before the jury. *See*, IMWINKELREID, *supra*, §§ 8:11–12 (defense can limit, or even exclude other crimes evidence by entering stipulations admitting the fact on which the evidence would be admissible); CHRISTOPHER MUELLER & LAIRD KIRKPATRICK, MODERN EVIDENCE § 4.4 at 262 (1995). For example, defense counsel declined to stipulate to chain of custody, with the result that the testimony of the medical examiner who removed the bullet from one of the bodies was then made necessary. The trial court tried to encourage the stipulation, telling defense counsel, "[O]nce you bring in a doctor who's going to testify about two killings out there in Maryland, that's going to have certainly some [e]ffect on the jury." Similarly, when the prosecutor proposed a stipulation to the effect that the Maryland bullets were found in and around the boys' bodies, defense counsel noted in refusing:

Your Honor, it occurs to me that we can establish all of that through testimony. I

mean, it doesn't really seem necessary to stipulate to it really. I mean, there are going to be Maryland police officers who were on the scene. They can talk about that and I'm not going to seriously question it, but I don't think that we need to actually stipulate to it.

Some of the colloquy between court and counsel illustrates the court's appropriately active effort to reduce the potential impact that any possibly inflammatory material would have on the jury sitting in judgment of Johnson.[22] The only potentially inflammatory photograph the court allowed before the jury was one that included the hall entranceway to the bedroom, but not the apparently bloodied room itself. The court rejected a request that an autopsy photo be shown to the jury. It expressly did not allow the prosecution to play the audiotape of the call Brown placed to 911 immediately after she discovered the bodies, again showing sensitivity to the potentially inflammatory nature of the evidence. Further, at the start of trial, the court granted a defense request to question potential jurors during *voir dire* concerning whether they would be improperly influenced concerning the District charges by the Maryland homicides, thereby both screening and desensitizing the panel.

The prosecutor touched on the Maryland killings in his summation, saying at one point:

Then you can conclude one of the boys woke up, and the two boys were executed. They would have recognized [appellant and Void], wouldn't they? Yes. Yes. The same .45 that shot the second bullet into Tyrone Carrington put three bullets in the boys.

That's the point of all that evidence about the three shell casings there lying around the boys, one bullet in the floor where one boy had been, one bullet out of one boy's ear, one bullet out of one boy. The one who had the one in his ear, another bullet dug out of him in the autopsy in Maryland.

Referring to the "execution" of the two boys may have been unduly dramatic. *See Sellars v. United States*, 401 A.2d 974, 977–78 (D.C.1979) (describing shooting as execution). Similarly, noting that one bullet came from "one boy's ear" and that another bullet was "dug out of him in the autopsy in Maryland," was unnecessarily graphic. *Mills v. United States*, 599 A.2d 775, 787 (D.C.1991) ("pool of blood" and suffering of victims). Yet we find that these isolated comments do not warrant reversal, especially in light of the fact that defense counsel had so dwelled upon bullets and body parts during the presentation of evidence that the prosecutor's comments injected little new into the proceedings. Further, in his summation, defense counsel freely discussed the matters of brain tissue and autopsies, again rendering the prosecutor's argument unstartling. And the prosecutor's only comment on rebuttal concerning brain tissue was obviously in direct response to the argument defense counsel made concerning the very same material.

We are not suggesting that defense counsel was ineffective in conducting a defense that focused in part on some of the more disturbing evidence. Rather, we point out defense counsel's questions and summation to show that this material was important and could be handled in a responsible manner. And we can summarize our review of the

---

**22.** THE COURT: Let me see the pictures. You [the prosecutor] may not be able to get those in.
[DEFENSE COUNSEL]: Your Honor, I don't think I'm going to challenge that anyway, the testimony of the officers as to where the bullets were found and so on.
THE COURT: You can't challenge that.
[DEFENSE COUNSEL]: No.
THE COURT: There's nothing to challenge on that.
[DEFENSE COUNSEL]: Right.
THE COURT: But you may be able to challenge these pictures. This is important. The important thing is that [the prosecution] get the testimony in that these are the same shells or the same bullets that were fired from this weapon that killed the deceased in the District of Columbia.
[THE PROSECUTOR]: That's right. I've set aside a good number of the rest of the pictures that show a lot more of the bodies.
THE COURT: Well, let me see what you got there.
[THE PROSECUTOR]: This is just coming into the bedroom where the boys were. That's the door coming in.
THE COURT: That's not important to this trial. I don't think I'm going to allow those photos, but you can certainly bring in the testimony.

manner in which evidence of the Maryland killings was used at trial by saying that, in light of all the considerations we have discussed, we are satisfied that Johnson was not unfairly prejudiced.[23] We certainly could not conclude that the trial judge abused his discretion in his exercise of control over the development and use of that evidence.

### IV.

▇▇▇▇ Johnson also argues that the prosecutor violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to inform the defense that he had made something in the nature of an offer of leniency to witness Freddie Crawford. We find this claim unpersuasive, and comment on only one facet of it. Freddie Crawford was a defense witness, and therefore the prosecution did not have to disclose the fact that an offer concerning unrelated charges had been made to him when he was called as part of the defense case. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). We find no merit, at least under the circumstances of this case, in Johnson's argument that because of the prosecution's offer Crawford had become the "functional equivalent" of a government witness before he was called as a defense witness. The prosecutor, however, may have risked reversal by not making disclosure prior to calling Crawford as part of prosecution's rebuttal, since Crawford was then unmistakably a witness for the prosecution and subject to impeachment by reference to any offer of leniency. But it does not follow that the failure to disclose the offer until after Crawford's testimony required a mistrial. Rather, the court acted within its discretion in offering remedial options short of mistrial. *See, e.g., Smith v. United States,* 363 A.2d 667, 668 (D.C.1976) (continuance). In this case, we do not find that the trial court abused its discretion in denying the motion for mistrial, since the court offered to permit the re-opening of the examination of the witness, and also read a stipulation to the jury adequately conveying the undisclosed material. *See Jackson v. United States,* 650 A.2d 659, 661 & n. 4 (D.C.1994) (trial court remedy avoided *Brady* error). Thus, we cannot agree that the government's failure to make earlier disclosure of its approach to Crawford was "material" because we are satisfied that there was no reasonable probability that, especially in light of the trial court's post-disclosure actions, the result of the proceeding would have been different, *see, e.g., James v. United States,* 580 A.2d 636, 644 (D.C.1990), and our confidence in the outcome of the trial is not undermined. *See Kyles v. Whitley,* —— U.S. ——, —— – ——, 115 S.Ct. 1555, 1565–67, 131 L.Ed.2d 490 (1995).[24]

### V.

Accordingly, the judgment on appeal is

*Affirmed.*

KING, Associate Judge, with whom TERRY, Associate Judge, joins, concurring:

I join the opinion of the court but write separately to express the view that because we are today adopting the balancing test of the Federal Rules of Evidence, Fed.R.Evid. 403, for so-called "other crimes" evidence, we should also adopt, in its entirety, Fed.R.Evid. 404(b), the underlying rule governing the

---

**23.** The dissent appends a portion of the vacated panel opinion in this case to make its point that the prosecution focussed unduly on the Maryland murders. That excerpt, however, conveys an erroneous impression by selectively quoting a few parts of a record of over 1100 pages. It fails to convey the impression that one cannot help but gain upon reading in their entirety all parts of the record, especially the government's opening statement and closing arguments, that the government did not call attention to those murders in a disproportionate or inappropriate way. Moreover, by quoting from our opinion in *Williams v. United States,* 382 A.2d 1, 7 (D.C. 1978), the excerpt may convey the mistaken impression that the trial judge gave a cautionary instruction regarding other crimes evidence only in his "charge in chief" at the end of trial, when in fact he gave such an instruction both during the course of trial and in his final charge.

**24.** As to appellant's argument that the trial court erroneously admitted two co-conspirator statements, we find it to be without merit. *See Butler v. United States,* 481 A.2d 431 (D.C.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985).

admissibility of that evidence. *See Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964). Doing so would be consistent with our past practice when we have adopted specific provisions of the Federal Rules of Evidence.[1]

Rule 404(b) provides:

**(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

As the *en banc* court today acknowledges, the portion of Rule 404(b) appearing before the word "provided" is "consistent with District of Columbia law." *Ante* at 1100, note

17.[2] Formal adoption of the remainder of Fed.R.Evid. 404(b), however, would result in two major changes in our practice. First, we would no longer require that the prosecution preliminarily show, by clear and convincing evidence, that the defendant committed the other crimes,[3] because the Supreme Court has unanimously rejected the need for such a showing, having held that, subject to a probative/prejudicial balancing, the other acts should be admitted "if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." *Ante* at 1100, note 18; *see Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). Second, we would also be adopting the requirement of Rule 404(b), set forth above after the word "provided," that the prosecutor give advance notice of its intent to use other crimes evidence when requested to do so by the accused. *See ante* at 1100 note 17. I submit, for the reasons stated below, that these considerations should not prevent us from adopting Fed.R.Evid. 404(b) together with authoritative judicial interpretations of its meaning.[4]

---

1. We have specifically adopted the following Federal Rules of Evidence: 405(a), 406, 703, 705, 801(d)(2)(E), and 804(b)(3). *See Rogers v. United States*, 566 A.2d 69, 75 (D.C.1989) (en banc) (adopts Rule 405(a), permitting a character witness to testify as to the witness's own opinion of a party's character); *Smith v. United States*, 583 A.2d 975, 983 (D.C.1990) (adopted approach of Rule 406 which provides that evidence of the routine practice of an organization is admissible to show that organization's conduct on a particular occasion was in conformity with the routine practice); *In re Melton*, 597 A.2d 892, 901 n. 10 (D.C.1991) (en banc) ("we adopt the language of Rule 703" relating to an expert witness's reliance upon "facts or data" which themselves are not admissible); *Clifford v. United States*, 532 A.2d 628, 633–35 (D.C.1987) (adopted provision of former version of Rule 705 "under which trial court may order that a party proffering expert testimony turn over ... any report ... on which the expert relied in forming the opinion" which will be expressed during testimony); *Butler v. United States*, 481 A.2d 431, 439 (D.C.1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985) ("[w]e hereby adopt Fed.R.Evid. 801(d)(2)(E) as controlling"; "[W]e also conclude, consonant with the approach of all the federal circuits, that under Fed.R.Evid. 104(a), the judge should determine the ultimate admissibility of coconspirators' statements"); *Laumer v. United States*, 409 A.2d 190 (D.C.1979) (en banc)

(adopting approach of Fed.R.Evid. 804(b)(3) for statements against penal interest).

2. Our "other crimes" admissibility rule traces its beginnings to *Drew, supra*, 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90, where the court held that "evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged ... [, however,] [e]vidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan ..., and (5) ... identity...."

3. *See Daniels v. United States*, 613 A.2d 342 (D.C. 1992).

4. The majority is understandably reluctant to adopt Rule 404(b) at this time because the issue has not been briefed by the parties. I agree that courts generally should not decide issues that have not been briefed, however, I would make an exception in this instance for two reasons. First, I am not suggesting that we adopt some untested principle that has not been subjected to the intense scrutiny, by the bench and bar, that the provisions of the Federal Rules of Evidence have undergone. Acceptance of those rules is widespread, and, where we have adopted specific provisions of the Federal Rules of Evidence in

As noted above, the admissibility portion of Rule 404(b) does nothing more than state District of Columbia law.[5] But Rule 404(b) does not require a clear and convincing showing as we do. In my view, the case in favor of the clear and convincing evidence requirement has never been made. For example, its origins are suspect, as demonstrated by Judge Kern in the opinion for the court in *Daniels v. United States,* 613 A.2d 342, 346–47 (D.C.1992), having evolved from dictum in a twenty-six-year-old case [6] decided by the United States Court of Appeals for District of Columbia, a court that no longer applies that standard itself because it is bound by *Huddleston.*

It is also significant that we have never expressed, in so many words, the reason that a showing by clear and convincing evidence is either necessary or appropriate. *See also Daniels, supra,* 613 A.2d at 347; *Groves v. United States,* 564 A.2d 372, 374 (D.C.1989) *modified per curiam,* 574 A.2d 265 (1990); *Lewis v. United States,* 567 A.2d 1326, 1330 (D.C.1989). The closest thing to an explanation of the need for that standard can be found in *Groves* where, in discussing *Huddleston,* the court observed that "Rule 404(b)'s policy of presumed admissibility differs significantly from this court's approach to the admission of other crimes evidence," *Groves, supra,* 564 A.2d at 375 n. 5. With respect, the *Groves* court's characterization of Rule 404(b) misinterprets that rule. Rule 404(b) begins, as does the *Drew* rule, by saying that "[e]vidence of other crimes ... is *not* admissible ...." (emphasis added). See note 2 *supra.* That is not the language of "presumed ad-

missibility," nor does it differ from our own law on the subject. *Ante* at 1100, note 17; *supra* note 4. Moreover, the *en banc* court today has significantly softened any rule of presumptive inadmissibility, that we may have previously applied in this context, by holding that evidence that qualifies for admission under any of the *Drew* exceptions should be excluded only if "the danger of unfair prejudice that it poses substantially outweighs its probative value." *Ante* at 1101. Therefore, the only justification for the higher standard that has ever been expressed in our cases has been substantially undercut by the opinion of the court in this case today. Because the only basis for the rule effectively has been eliminated, the rule itself serves no further useful purpose. Indeed, as one judge of this court has said: "I think it would make sense to conform our jurisprudence to *Huddleston;* a proposition convincing to all nine of the Supreme Court justices surely merits our consideration." *Daniels, supra,* 613 A.2d at 349 (Schwelb, J., concurring).

With respect to the provision in Rule 404(b) requiring the prosecutor to provide advance notice of its intent to use such evidence, there are several reasons why we should not hesitate to adopt that practice. First, speaking entirely from my own experience as a trial judge in the Superior Court from 1981 to 1991, I found that requiring advance notice of "other crimes" evidence improved both the court's and the parties' ability to efficiently resolve the cases affected. For example, before an advance notice

---

the past, we have, as often as not, done so without the benefit of the parties' views on the point. For example, an examination of the briefs filed in the six cases cited in footnote 1 shows that the parties did not address the question in three of them: *Clifford, Butler,* and *Smith.* In fact, in *Butler,* we went considerably beyond simple adoption of a federal evidentiary rule. In that case we adopted both Fed.R.Evid. 801(d)(2)(E) relating to the admissibility of a coconspirator's out-of-court assertion as nonhearsay evidence, and the approach of Fed. R.Evid. 104(a) requiring the trial judge, not the jury, to determine admissibility. *Id.* at 439. The court also adopted, however, without any input from the parties, two limitations on admissibility of this evidence even though there was sharp division among the federal courts concerning the

propriety of those limitations. *Id.* at 440–41. This history demonstrates that adopting provisions of the Federal Rules of Evidence by this court, without formal briefing, is not without precedent. Second, adoption of the *Huddleston* rule would be consistent with the decision made by the overwhelming majority of state courts that have decided the issue since *Huddleston* was decided. The cases addressing the issue are set forth in the appendix to this opinion.

5. In that regard, compare the language of Fed. R.Evid. 404(b) with the quote from *Drew* set forth in note 2 *supra.*

6. *United States v. Bussey,* 139 U.S.App. D.C. 268, 273 n. 23, 432 F.2d 1330, 1335 n. 23 (1970).

requirement was adopted, motions by the prosecutor, seeking admission of this kind of evidence, were generally made near or on the day of trial. Such late notice almost always prompted a defense request to postpone the trial based on the entirely reasonable ground that counsel needed additional time to investigate the circumstances of the "other crimes" evidence.[7] As a result, trials were frequently delayed. Requiring advance notice, however, essentially eliminated that problem. Moreover, with advance notice the court could rule on the admissibility of the evidence in advance of trial. Thus, well before trial, the defense was afforded a view of the nature of some of the evidence it would face, and the parties knew exactly what evidence the trial judge would, or would not, admit on that subject. Because of this early knowledge of the case, the parties would often reach some sort of disposition before the trial date.

Second, although I have not made a count, I have the impression that most Superior Court judges currently require advance notice so that imposing such requirement would not come as a major change in practice. *See ante* note 17. In *Ford, supra,* 647 A.2d at 1184, we stated "In view of our disposition of this case ... consideration of whether a [notice] requirement should be adopted for this jurisdiction ... can be left to another day." I submit that "day" has come and we should simply take the course that naturally follows from our adoption of Fed.R.Evid. 403 today, *i.e.,* we should adopt Fed.R.Evid. 404(b) as well.

## APPENDIX

In *Huddleston v. United States,* 485 U.S. 681, 687, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988), the Supreme Court, interpreting Fed.R.Evid. 404(b), rejected the contention that the trial court must make a preliminary finding that the government has proved the "other acts" by at least a preponderance of evidence. The Court held that, subject to a probative/prejudicial balancing, other crimes evidence is admissible "if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act."

*Id.* at 685, 108 S.Ct. at 1499. Although an exhaustive examination of the state courts' responses to *Huddleston* has not been undertaken, preliminary research revealed the following:

I. Courts in sixteen states have explicitly or implicitly adopted the *Huddleston* rule on admissibility of other crimes evidence: *State v. Barr,* 183 Ariz. 434, 904 P.2d 1258, 1264 (Ct.App.1995); *State v. Santiago,* 224 Conn. 325, 618 A.2d 32, 41 (1992); *People v. Davis,* 248 Ill.App.3d 886, 187 Ill.Dec. 660, 666–67, 617 N.E.2d 1381, 1387–88 (1993); *Christian–Hornaday v. State,* 649 N.E.2d 669, 672 (Ind. Ct.App.1995); *State v. Crawford,* 672 So.2d 197, 207 (La.Ct.App.1996); *State v. Dean,* 589 A.2d 929, 933 (Me.1991); *Commonwealth v. Wotan,* 37 Mass.App.Ct. 727, 643 N.E.2d 62, 66 (1994); *Gayten v. State,* 595 So.2d 409, 415 (Miss.1992); *State v. Thompson,* 244 Neb. 375, 507 N.W.2d 253, 268 (1993), *but see* Neb. Evid. R. 27–404 (subsection (3) added to require that court find by clear and convincing evidence); *State v. Moore,* 335 N.C. 567, 440 S.E.2d 797, 813 (1994); *State v. Broom,* 40 Ohio St.3d 277, 533 N.E.2d 682, 690 n. 1 (1988); *Blakely v. State,* 841 P.2d 1156, 1158 (Okla.Cir.1992); *State v. Johnson,* 313 Or. 189, 832 P.2d 443, 453 (1992); *State v. Winter,* 162 Vt. 388, 648 A.2d 624, 631 (1994); *State v. Herzog,* 73 Wash.App. 34, 867 P.2d 648, 654 (1994); *State v. Landrum,* 191 Wis.2d 107, 528 N.W.2d 36, 40 (1995).

II. Three states acknowledged *Huddleston,* but adopted a "preponderance of evidence" admissibility standard: *People v. Garner,* 806 P.2d 366, 373 (Colo.1991); *Harrell v. State,* 885 S.W.2d 433, 438 (Tex.Ct. App.1992); *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516, 526–27 (1994).

III. Courts in five states either rejected *Huddleston* for all purposes, or under a specified circumstance, or because there was contrary higher court precedent that predated *Huddleston: State v. Cohen,* 634 A.2d 380, 391 (Del.Super.Ct.1992) (applied clear and convincing standard for evidence phase of a capital sentencing proceeding; silent on *Huddleston's* applicability under other circumstances); *Phillips v. State,* 591 So.2d 987, (D.C.1994).

---

7. *See Ford v. United States,* 647 A.2d 1181, 1185

989 (Fla.Dist.Ct.App.1991) (followed binding precedent of state Supreme Court, requiring clear and convincing evidence, that had been established before *Huddleston*); *State v. Gruber,* 132 N.H. 83, 562 A.2d 156, 159–60 (1989) (adhered to requirement that there be "clear proof" of other crime); *State v. Cofield,* 127 N.J. 328, 605 A.2d 230, 235 (1992) (held "evidence of the other crime must be clear and convincing"); *Pena v. State,* 780 P.2d 316, 318 (Wyo.1989) (without reference to *Huddleston,* followed previous practice of requiring "plain, clear and convincing" evidence).

RUIZ, Associate Judge, concurring:

I agree that Johnson's conviction should be affirmed, but on a narrower ground than the majority opinion. First, I agree with Judge Ferren's dissent that the evidence of the boys' murders in Maryland—as opposed to evidence that the same gun that killed Carrington was also discharged in the Maryland apartment, and that a gun stolen from that apartment was found on Johnson—was of marginal relevance to the identity of Carrington's murderer, and that some of the repeated, detailed references to the boys' murder were prejudicial. Nonetheless, once the judge decided that the evidence was of relevance to the identity of Carrington's murderer and overruled the defense's objection that the evidence was inadmissible *in toto,* the defense took no action, either by agreeing to stipulate as to the identity of the bullets or by proposing that the evidence be sanitized, to avoid the prejudice. Further, and of prime importance to me, the motions judge preliminarily found, by clear and convincing evidence, that Johnson had committed the boys' murders; the defense was not unfairly surprised because it had been advised of the government's intention to use evidence of the boys' murders; the trial judge twice specifically instructed the jury on the purpose for which evidence of the boys' murders was admitted, as requested by the defense; and the trial judge concluded that the probative value of the evidence outweighed its potential for unfair prejudice. In the parlance of the majority opinion, the trial court did not abuse its discretion in admitting the evidence as an exception to the *Drew* rule. Thus, it is not necessary to decide as an alternative ground that the evidence was also admissible because, as "direct and substantial proof of the charged crimes" in this case, *see ante* at 1101, it was not *Drew* evidence even though it also would support prosecution of another crime.

In any event, I find the *Drew*/non-*Drew* distinction less than helpful. The issue, always, is whether evidence of uncharged conduct is being introduced to prove guilt by propensity or to obtain a conviction by means other than through evidence of the charged offense. If it is, as the majority notes, the evidence is inadmissible. *Ante* at 1104. If it is not offered for that purpose or is not likely to be used by the jury in that impermissible way, the evidence may be admissible. Then, because we are rightly concerned that evidence of uncharged conduct nonetheless may influence and confuse the jury with respect to the charged offense, we focus on what safeguards are appropriate to protect against unfair prejudice: Is the evidence necessary, or can the same fact be proven otherwise? Should its introduction be delayed to allow for the possibility that the course of the trial may obviate its necessity? How certain is it that the uncharged conduct was committed by the defendant? Does the jury understand the proper purpose of the evidence? This pragmatic approach is preferable to a rule of presumptive inclusion of "non-*Drew*" evidence or presumptive exclusion of "*Drew*" evidence. This is not an area for presumptions or formulaic labeling as "*Drew*" or "non-*Drew*," but for careful balancing by the trial court of the probativeness of the evidence against the potential for prejudice, including consideration of measures available to mitigate prejudice.

Notwithstanding my views on the merits of how we should consider the admission of evidence of uncharged conduct, however, we should not in this case change our law concerning the presumption that has been developed in our caselaw with respect to the balancing of probative value versus prejudice to determine the admissibility of evidence of uncharged conduct. That is, unfortunately, what the majority has done by adopting the

policy in favor of admission that results from application of the test in Federal Rule of Evidence 403, whether "probative value is substantially outweighed by the danger of unfair prejudice," to uncharged conduct that is determined to come under a *Drew* exception. The presumption heretofore applied against admission of evidence of uncharged conduct is no longer operative, for once such evidence is determined to be relevant as a result of the government's showing that the evidence comes within a *Drew* exception, the FRE 403 balancing test would come into play as it does for all relevant evidence. *See ante* at 1103 ("We conclude that we should also follow [the FRE 403] policy regarding evidence that is subject to a *Drew* analysis but qualifies for admission under any of the exceptions to *Drew.*") If once deemed to come within a *Drew* exception, evidence of uncharged conduct is no longer subject to a presumption against admission, but is instead evaluated under the FRE 403 balancing test, the policy in favor of admission in FRE 403 has the effect of reversing the presumption with respect to whether uncharged conduct should be admitted.[1] I recognize that the majority has taken a somewhat more restrictive view than does FRE 403 by suggesting, *ante* at note 19, that where the prejudice from evidence of uncharged conduct substantially outweighs its probative value, the trial court "should" exclude it. (FRE 403 states that such evidence "may" be excluded.) The majority's slight revision of FRE 403 still allows, however, for the possibility that a trial judge could admit evidence of uncharged conduct even where the prejudice from its admission substantially outweighs its probative value. Therefore, bearing in mind our heretofore presumption against the admissibility of evidence of uncharged conduct, even with this improvement in the application of the FRE 403 balancing test, I agree with the analysis in Judge Ferren's dissent, *infra* at [1113–1115], that the majority has significantly changed our law with respect to the admissibility of evidence of uncharged conduct.

That change is unwarranted. Resolution of this case does not require any such change in our law, as neither the majority nor I believe that the trial court abused its discretion in determining that the evidence was admissible without need of a tipping of the scales in favor of admission. Moreover, the government has not proposed that we adopt FRE 403 and neither party has addressed whether the policy of the Federal Rules of Evidence with respect to the balancing of probative value versus unfair prejudice should be applied to evidence of uncharged conduct. Finally, as Judge King's concurrence and Judge Ferren's dissent note, by adopting the balancing test of FRE 403 in the context of evidence of uncharged conduct, yet not adopting FRE 404(b), the majority has gone only part-way toward adoption of the Federal Rules of Evidence that concern admissibility of uncharged conduct, without considering the balance struck in those rules between admissibility thresholds and safeguards. This partial adoption of the relevant federal rules also undermines an important reason for following the rules, the benefit of federal and state court interpretations of those rules. I do not think we should adopt FRE 404(b) in this case for the same reason that we should not adopt only part of the federal rules relevant to evidence of uncharged conduct: we should not change our law in such a sensitive area without even having had the benefit of briefing on the issue.

FERREN, Associate Judge, dissenting:

The result of the decision today is to permit the prosecutor to charge Johnson with one murder, in the District of Columbia, but also—in order to help seal the case against him here—to present evidence to the jury that Johnson committed two other murders (for which there had not been convictions) in Maryland. In doing so, the court today upsets the fair administration of criminal justice in the District of Columbia, not only by reaching the result it does in this case but also by altering the long-established probative/prejudicial balancing test for admissibili-

---

1. I would expect that under the majority's approach trial courts would continue to be keenly aware (if not presume) that evidence of un-

charged conduct—even if it comes under a *Drew* exception—can be very prejudicial.

ty of "other crimes" evidence. Furthermore, even under the en banc majority's newly announced standard, the trial judge erred as a matter of law, and thus abused his discretion, in ruling that the evidence of the Maryland murders of two young boys was more probative than prejudicial. I would reverse and remand for a new trial. Respectfully, therefore, I must dissent.

## I.

I cannot help believing that the result here would be different if the majority had not adopted FED.R.EVID. 403—authorizing admission of "relevant" evidence unless the trial judge determines that "its probative value is *substantially* outweighed by the danger of unfair prejudice"—as the appropriate balancing test for a trial judge to apply when considering the admissibility of "other crimes" evidence.[1] In this jurisdiction, we have long followed the common law "exclusionary" approach to other crimes evidence represented by the *Drew* line of cases.[2] Such evidence is "presumptively inadmissible."[3] It cannot be shown to the jury unless the prosecutor proves that it falls within a recognized *Drew* exception, see *supra* note 2, and further demonstrates that its probative value for the government outweighs any

prejudicial impact on the defendant.[4] My colleagues now dilute and confuse the test for admissibility in several important ways by adopting a new formulation—FED.R.EVID. 403 (modified)/404(b) (in part)—to replace *Drew*. I explain, first, why this rule is indeed new. I address, next, why I believe it is ill-advised.

## A.

The majority says that the portion of Fed. R.Evid. 404(b) italicized below is "consistent with District of Columbia law." *Ante* at 1100 n. 17. The federal rule provides in full:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show actions in conformity therewith. *It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident,* provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

1. FED.R.EVID. 403 provides in full:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

2. *Drew v. United States,* 118 U.S.App. D.C. 11, 16, 331 F.2d 85, 90 (1964) (other crimes evidence admissible only when relevant to motive, identity, absence of mistake or accident, or common scheme or plan and "prejudicial effect [is] outweighed by the probative value"). Because, under *Drew,* other crimes evidence has been presumptively inadmissible since it tends to suggest a propensity to commit crime, rather than bearing directly on the crime charged, we have characterized this traditional *Drew* approach as an "exclusionary" rule. *Holmes v. United States,* 580 A.2d 1259, 1268 (D.C.1990) ("Since *Rindgo [v. United States,* 411 A.2d 373 (D.C.1980)], this court has explicitly elected to follow the exclusionary approach rather than the more permissive federal one."); *Thompson v. United States,* 546 A.2d 414, 424 n. 18 (in contrast with federal " 'inclusionary rule,' " District of Columbia "fol-

lows the exclusionary rule under which the prosecutor has the burden of showing that the evidence falls within one or more of the recognized exceptions").

3. *Robinson v. United States,* 623 A.2d 1234, 1238 (D.C.1993) ("it has long been the rule in this jurisdiction that evidence of a defendant's other crimes is presumptively inadmissible, with the burden on the prosecutor to rebut this presumption").

4. *See, e.g., King v. United States,* 618 A.2d 727, 730 (D.C.1993); *Yelverton v. United States,* 606 A.2d 181, 182 (D.C.1992); *Hill v. United States,* 600 A.2d 58, 63 (D.C.1991); *(James) Johnson v. United States,* 596 A.2d 980, 984 (D.C.1991), *cert. denied,* 504 U.S. 927, 112 S.Ct. 1987, 118 L.Ed.2d 585 (1992); *Jefferson v. United States,* 587 A.2d 1075, 1078 (D.C.1991); *Parker v. United States,* 586 A.2d 720, 724 (D.C.1991); *Harper v. United States,* 582 A.2d 485 488 (D.C.1990); *Thompson,* 546 A.2d 414, 420 (D.C.1988), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987); *German v. United States,* 525 A.2d 596, 607 (D.C.1987); *Rindgo v. United States,* 411 A.2d at 376.

FED.R.EVID. 404(b) (1991 amendment) (emphasis added).[5] The majority expressly rejects the balance of the rule ("provided ... trial"). *See ante* at 1100 n. 17. The majority then purports to "clarify" that this jurisdiction "will follow" FED.R.EVID. 403, *supra* note 1, "regarding the admission of evidence generally," *ante* at 1099, and thus will apply that rule to admission of other crimes evidence under *Drew*/404(b) (italicized portion). See *ante* at 1100.[6] As a result, the majority has created a new other crimes evidence rule. By combining adoption of Rule 403 ("substantially outweighed") with Rule 404(b) (italicized portion), the majority maintains the traditional *Drew* exceptions, see *supra* note 5, but admittedly adopts a probative/prejudicial balancing test that is more burdensome on a defendant than this court's traditional approach to other crimes evidence under *Drew*.

In sum, the majority has supplanted the *Drew* line of cases with a 403/404(b) approach which—as reflected in federal case law—is at odds in important respects with the law previously in effect in our local courts.

### B.

The defects in the majority's approach are serious. *First*, by only partially adopting the federal approach, the majority withholds an important protection. FED.R.EVID. 404(b)— in the part that the majority declines to adopt—expressly conditions admission of other crimes evidence on a requirement that,

upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED.R.EVID. 404(b) (1991 amendment). The majority rejects this requirement without explaining why, *see ante* at 1100 n. 17, and thereby denies defendants a critical right to notice that the federal rules provide to compensate, at least in part, for a more relaxed approach to admissibility under FED.R.EVID. 403/404(b) than our *Drew*, exclusionary approach has allowed. *See Ford v. United States*, 647 A.2d 1181, 1184–85 (D.C.1994) (leaving "to another day" decision whether to adopt FED.R.EVID. 404(b) notice requirement); *Lewis v. United States*, 567 A.2d 1326, 1329 (D.C.1989) ("no specific rule" in this jurisdiction that "government provide advance notice of its intention to introduce *Drew* evidence").

*Second*, the majority opinion does not otherwise make clear exactly what the new rule encompasses. Some federal circuits, for example, define the relevance of other crimes evidence rather narrowly under FED.R.EVID. 404(b),[7] whereas others see relevance far more broadly.[8] Several federal circuits also require the prosecutors to make particularized proffers, and the trial courts to make on-the-record findings, in cases involving other crimes evidence,[9] and at least one circuit has

---

**5.** *See Drew, supra* note 2, 118 U.S.App. D.C. at 16, 331 F.2d at 90 ("Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial.").

**6.** In *Huddleston v. United States*, 485 U.S. 681, 688, 108 S.Ct. 1496, 1500–01, 99 L.Ed.2d 771 (1988), the Supreme Court said that when other crimes evidence is offered under FED.R.EVID. 404(b) for a proper purpose, *e.g.,* motive, intent, the FED.R.EVID. 403 probative/prejudicial balancing test that generally applies to all evidentiary submissions also governs the admission of other crimes evidence.

**7.** *See United States v. Mora*, 81 F.3d 781, 783 (8th Cir.1996) (four part test, including requirement

that "bad act or crime is similar in kind and reasonably close in time to the crime charged"); *United States v. Neely*, 980 F.2d 1074, 1079 (7th Cir.1992) (same); *United States v. Houser*, 929 F.2d 1369, 1373 (9th Cir.1990) (same).

**8.** *See Huddleston*, 485 U.S. at 687, 108 S.Ct. at 1500 (relevant evidence is "evidence that makes the existence of any fact at issue more or less probable"); *United States v. Castiello*, 915 F.2d 1, 4–5 (1st Cir.1990) (two part test; Rule 404(b) has "inclusive rather than exclusionary nature: should the evidence prove relevant in any way it is admissible, subject only to the rarely invoked limitations of Rule 403").

**9.** *See United States v. Birch*, 39 F.3d 1089, 1093 (10th Cir.1994) ("government must precisely articulate the purpose of the proffered evidence"); *United States v. Manner*, 281 U.S.App. D.C. 89, 94, 887 F.2d 317, 322 (1989) (trial court's bal-

reserved *de novo* appellate review of the question whether other crimes evidence falls within the scope of FED.R.EVID. 404(b).[10] We are not told which of these approaches the majority is adopting or rejecting—or why— and yet each can have significant bearing on the fairness of the admissibility decision.

*Third,* under the new regime, other crimes evidence will now be admissible unless the danger of unfair prejudice "substantially" outweighs probative value, a formulation that allows admission of evidence that to some extent is more prejudicial to the defendant than of probative value to the government.[11] A respected treatise concludes that, under FED.R.EVID. 403, "the discretion to exclude [other crimes evidence] does not arise when the balance between the probative worth and the countervailing factors is debatable; there must be a *significant tipping of the scales against* the evidentiary worth of the proffered evidence." 22 CHARLES A. WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5221, at 309–10 (1978) (footnote omitted) (emphasis added). Another respected author says that by adding the adverb, "substantially," before the verb, "outweighed," "Rules 404(b) and 403 may not only shift the burden to the defendant; they may do so with a vengeance." EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVI-

DENCE § 8:28, at 58 (1995). In *Huddleston,* moreover, the Supreme Court candidly recognized this lowering of the barrier against prejudicial other crimes evidence: "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence." *Huddleston,* 485 U.S. at 688–89, 108 S.Ct. at 1501.

*Fourth,* the majority opinion purports to retain *Drew*'s traditional requirement that "the prosecutor has the burden of showing that the evidence falls within one or more of the recognized exceptions." *Thompson,* 546 A.2d at 424 n. 18, *quoted ante* at 1100. The majority also suggests that the government has the burden of demonstrating that probative value is not substantially outweighed by prejudicial impact. *See ante* at 1101 (citing *United States v. Conners,* 825 F.2d 1384, 1390 (9th Cir.1987)). Such assurances provide little comfort, however, for under the new rule the government's burden isn't what it used to be.

In the first place, the government's burden of persuasion is substantially reduced because, contrary to *Drew*'s "exclusionary" presumption, other crimes evidence is presumptively admissible under FED.R.EVID.

ancing of probative value/prejudicial impact should occur on the record); *United States v. Alfonso,* 759 F.2d 728, 739 (9th Cir.1985) ("government 'must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from other acts' evidence' " (quoting *United States v. Mehrmanesh,* 689 F.2d 822, 830 (9th Cir.1982))).

10. *See United States v. Arambula–Ruiz,* 987 F.2d 599, 602 (9th Cir.1993) (decision to admit other crimes evidence reviewable under abuse of discretion standard, but "the issue of whether the evidence falls within the scope of Rule 404(b) is reviewed *de novo* ").

11. FED.R.EVID. 403 says that relevant evidence "*may be* excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Supra* note 1 (emphasis added). The federal rule, therefore, apparently gives the trial court discretion to admit evidence even when prejudice *substantially* outweighs probative value. Recognizing this possibility, the majority backs away from a pure FED.R.EVID. 403 approach. My colleagues substitute "should" for

"may" in FED.R.EVID. 403 and thus tell trial courts that other crimes evidence "should be excluded" if probative value "is substantially outweighed" by the danger of unfair prejudice.

It is unclear from this change of language whether the majority thinks it is putting a strict limitation on the application of FED.R.EVID. 403 to other crimes evidence or not; "should" is an advisory word, without the mandatory impact of "shall" or "must." If the majority believes it is not adding a strict limitation to FED.R.EVID. 403, then it is massively changing the present other crimes evidence rule in favor of allowing admission of evidence having prejudicial impact that substantially outweighs probative value. If, on the other hand, the majority believes it is imposing a limitation—*i.e.,* adopting a special "other crimes FED.R.EVID. 403" or a "FED.R.EVID. modified" by substituting "should" for "may"—then the majority implicitly acknowledges its willingness to modify the federal rule to meet local needs, and we now have a new, unique rule— FED.R.EVID. 403 (modified)/404(b) (partial)—to control admission of other crimes evidence.

403/404(b)'s "inclusionary rule."[12] This means that, in connection both with identifying an exception that allows admission in a particular case (*e.g.*, identity, intent) and with weighing probative value against prejudicial impact, the government will make its prima facie showings more easily—and thus the burden of production will shift to the defendant more quickly—than under *Drew*. Furthermore, because the evidence will be admissible unless "substantially" outweighed by prejudice, the government's burden will be further reduced; the burden of production will fall not only very quickly, but also especially hard, on a defendant who has to rebut the government's minimal initial showings under a rule inherently designed to put the burden of *persuasion* on the defendant to demonstrate *substantial* prejudicial impact.[13]

The majority does not directly dispute this analysis. My colleagues no longer confirm this court's long-standing rule that other crimes evidence is "presumptively inadmissible," *Robinson v. United States, supra* note 3, 623 A.2d at 1238; they prefer a new, more neutral formulation: "[i]n all instances the proponent of the evidence must satisfy the court that it should be admitted." *Ante* at 1101. Especially in light of federal court jurisprudence construing the rules the majority now adopts, the proponent's burden, therefore, no longer will mean in this jurisdiction what it has meant under *Drew*. As Judge KING candidly acknowledges, "the *en banc* court today has significantly softened any rule of presumptive inadmissibility[ ] that we may have previously applied in this context," *ante* at 1107, especially because prejudice must "substantially" outweigh probative value before other crimes evidence

meeting an identified *Drew*/404(b) exception is excludable.

The majority, in fact, acknowledges the potential significance of the change it now adopts: a likely increase in admissibility of other crimes evidence. According to the majority's articulation of the difference between the exclusionary (*Drew*) and inclusionary (federal) approaches, respectively:

> In close cases, at least, [the other crimes evidence] determination may be controlled by whether (1) admission is appropriate only where probative value exceeds prejudicial impact [*Drew*] or, conversely, (2) admission should be permitted unless prejudicial impact exceeds (or substantially exceeds) probative value [Rule 403]. *The difference is not merely semantic, as it may spell the difference between admission and exclusion.*

*Ante* at 1098 (citation omitted) (emphasis added). The majority, therefore, admittedly makes it inherently easier under the new 403/404(b) approach than under *Drew* for the government to carry its burden when proffering other crimes evidence. *See supra* note 11.

### C.

For three reasons, I very much disagree with the court's shift to the federal formulation. First, as elaborated above, the majority's new rule literally permits a judge to admit other crimes evidence that is more prejudicial to the defendant than of probative value to the government. Indeed, because the majority merely says the trial court "should" exclude other crimes evidence *if the danger of unfair prejudice substantially outweighs its probative value, ante* at 1104 & n. 19, my colleagues appear to leave the trial

**12.** *See Groves v. United States,* 564 A.2d 372, 375 n. 5 (D.C.1989) ("Rule 404(b)'s policy of presumed admissibility differs significantly from this court's approach to the admissibility of other crimes evidence"); *Thompson,* 546 A.2d at 424 n. 18 ("Rule 404(b) of the Federal Rules of Evidence is viewed as an 'inclusionary rule' under which other crimes evidence is admissible except when it tends to prove only criminal disposition."); *Harris v. State,* 324 Md. 490, 597 A.2d 956, 962 (1991) (under common law, exclusionary approach to other crimes evidence, as opposed to federal, inclusionary approach, the party offering the evidence has "the burden of

demonstrating relevance other than criminal character, as well as the burden of demonstrating that the probative value substantially outweighs the potential for unfair prejudice").

**13.** *See United States v. Culver,* 929 F.2d 389, 391 (8th Cir.1991) ("It is defendant's burden [under 404(b)] to show the evidence clearly had no bearing on any of the issues involved."); IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 8:28, at 58 (wording of FED.R.EVID. 403 "suggests that the defendant has the burden").

judge with at least a modicum of discretion to admit such evidence even when prejudice does substantially outweigh probative value.[14] The majority could foreclose that possibility by saying such evidence "shall" or "must" be excluded in such circumstances, but it chooses not to do so. It is therefore unclear how much, if at all, the majority modifies FED. R.EVID. 403 for other crimes evidence. See *supra* note 11.

Even on the assumption that the majority has adopted a slightly modified FED.R.EVID. 403 by substituting "should" for "may," see *supra* note 11, I cannot accept the result. I agree, of course, with the majority's implicit admission that a pure FED.R.EVID. 403 approach to other crimes evidence would be too radical because it literally would allow admission of other crimes evidence with prejudicial impact that substantially outweighs probative value. But I am deeply concerned about a majority decision that, while recognizing the mischief possible under FED.R.EVID. 403 as written, is willing nonetheless to modify the rule only very slightly, leaving the trial court with permission to admit other crimes evidence with prejudicial impact that exceeds its probative value unless the difference is "substantial." In all its many pages the majority opinion never really tells us why. As best I can tell, the majority keeps the word "substantially" in the rule simply because the federal rules are commonly followed and because uniformity, abstractly, is a good idea. But the uniformity rationale melts away once the majority begins to fiddle with the rule's text by eliminating the word "may," see *supra* note 11, (just as it has severed and discarded part of FED.R.EVID. 404(b)). Having crossed the Rubicon by rejecting parts of two federal rules, why does the majority accept, rather than excise, the word "substantially" without giving a clear, persuasive reason for doing so?

Second, by substituting the federal "inclusionary" rule for *Drew*'s common law "exclusionary" rule, this court's decision today is flawed in other ways that leave a reader guessing about the impact: (1) the opinion leaves entirely unclear how the evidentiary burden of persuasion under the federal "inclusionary rule" can nonetheless remain—as it purportedly does—on the government as under *Drew*; (2) the majority inexplicably declines to adopt important protections that the omitted language of FED.R.EVID. 404(b) provides, as well as interpretations that various federal courts have supplied, to compensate for liberalized admissibility under the federal rules. Accordingly, the majority's approach is only a partially formulated, and thus insufficiently explicated, change in our longstanding, workable rule.[15]

Third—as this point bears special emphasis—the government has not argued for this change. There is not one citation to FED. R.EVID. 403 or 404(b) in the prosecutor's brief, and the court has not sought supplemental briefing. So why is this court on such a self-generated frolic, unaided by the parties' views? Why has this court simply decided on its own to make a profound change in the law, without asking for comments by the government and the accused, as well as for *amicus curiae* participation by the Public Defender Service?[16] I believe the

---

**14.** See *supra* note 11 (comparing majority's substitution of the word "should" for "may" in FED.R.EVID. 403 when the trial court considers admission of other crimes evidence).

**15.** Judge Belson comfortably cites the fact that a majority of the states have taken the federal route. *See ante* at 1099–1100 & n. 14. This in itself does not say whether the states abandoned a comprehensive, workable jurisprudence or merely adopted the federal rule for convenience; it does not indicate whether the states adopted FED.R.EVID. 404(b) in whole or in part; it does not demonstrate whether the states have adopted interpretive protections that may narrow the range of admissibility; and it does not report whether the federal rule was adopted by the court or imposed by the legislature. The majori-

ty, therefore, cites companion states without offering assurance that this court is doing what others have done.

**16.** The majority purports merely to "clarify," not change, the probative value/prejudicial impact analysis applicable to other crimes evidence. See *ante* at 1099. It then cites "as authoritative," *ante* at 1099, cases referring to FED.R.EVID. 403 only as it concerns admission of facts and data underlying expert testimony, *Reed v. United States,* 584 A.2d 585, 591 (D.C.1990), and admissibility of expert testimony under the "ultimate issue rule," *Lampkins v. United States,* 401 A.2d 966, 970 & n. 9 (D.C.1979). Neither case concerns other crimes evidence and FED.R.EVID. 404(b). It is true, of course, that anyone is able to find occasional, unanalyzed references to FED.

majority acts precipitously, and thus imprudently, in adopting, *sua sponte*, an ill-defined change in this court's approach to other crimes evidence—a change derived from partial adoption of the federal approach—without asking for help in identifying and evaluating all the consequences, overt and subtle.

In sum, by applying a modified FED. R.EVID. 403 to permit admission of other crimes evidence unless "*substantially* outweighed by the danger of unfair prejudice"; by purporting to keep the burden of persuasion on the government while significantly lowering it to a point where the heavier burden is shifted to the defendant; by embracing one part and omitting another part of FED.R.EVID. 404(b); by failing to discuss, let alone resolve, what critical judicial interpretations do and do not apply; and by declining to invite any participation whatsoever by the government and the defense bar to help the court understand all the implications of what it is doing; the majority invites conflicting interpretations of today's en banc opinion, as well as extensive, costly, and time-consuming legal disputes as litigants struggle to understand and shape the court's new rules pertaining to other crimes evidence.

The majority's new approach does not reflect a principled change. It represents an unbalanced, inequitable move away from a longstanding, fair and workable rule for admission of other crimes evidence. The new formulation is a verbal invitation for Superior Court judges to relax the barriers against admissibility, which have now become rebuttable by a lesser showing: that prejudicial impact does not "substantially" outweigh probative value. I believe that any such shift increases the likelihood that highly prejudicial evidence of criminal propensity will be spread before the jury.[17]

## II.

With all this said, I believe even the majority's newly adopted test for exclusion of other crimes evidence is met here. The evidence from Crystal Brown's Maryland Glassmanor Drive apartment was important to the government's case because that apartment allegedly was the "production center," *ante* at 1091, for the drug conspiracy with which Johnson was charged; because .45 caliber bullets and shell casings were found there which expert testimony linked to Carrington's murder; and because a week after Carrington's murder, the police found on Johnson a 9mm. pistol which had been stolen from the apartment that same night. In short, this evidence tended to prove that very soon after Carrington had been killed, Johnson had been in the apartment where the police later discovered evidence of one of the guns that killed Carrington. I have no problem with admission of this evidence under either *Drew* or the FED.R.EVID. 403/404(b) identity exception, as Judge Eilperin permitted in the separate trial of Johnson's confederate,

R.EVID. 403 and 404(b), used together, in this court's opinions. *See, e.g., Lee v. United States,* 454 A.2d 770, 774 (D.C.1982) *reh'g denied,* 464 U.S. 1064, 104 S.Ct. 747, 79 L.Ed.2d 204 (1984) (bare citation to FED.R.EVID. 403); *Campbell v. United States,* 450 A.2d 428, 430–31 & n. 3 (D.C. 1982) (stating "District of Columbia practice is also generally consistent with FED.R.EVID. 403"). I am satisfied, however, that the opinions of this court which actually have come to grips with the issues presented here have stressed that this jurisdiction's probative value/prejudicial impact analysis differs significantly from the federal approach. *See Holmes,* 580 A.2d at 1267; *Groves,* 564 A.2d at 375 n. 5; *Thompson,* 546 A.2d at 424 n. 18. The en banc court, of course, has the power to change the existing law, but, when it does so, it should do so directly in the name of change, not so-called clarification.

In any event, however one should characterize what the court is doing today, the court acknowledges that the implications are significant. See *ante* at 1098–1099. The majority appears to recognize, moreover, that it should not act precipitously, without briefing and argument, when it considers, but rejects, Judge KING's proposal to adopt the primary rule of *Huddleston, supra* note 6, interpreting FED.R.EVID. 404(b) (trial court need not make preliminary finding that similar act occurred; evidence only must be sufficient to allow *jury to find,* by preponderance of evidence, that similar act occurred). See *ante* at 1100 n. 18.

17. One salutary feature of the majority opinion, as I see it, is in its indication that trial courts will now be accountable for giving special cautionary instructions limiting use of non-*Drew* other crimes evidence—*see, e.g., Toliver v. United States,* 468 A.2d 958 (D.C.1983)—when prejudice is apparent. See *ante* at 1097 n. 10.

Bruce Void. *See Void v. United States,* 631 A.2d 374, 378 (D.C.1993).

I do find erroneous, however, Judge Eilperin's admission in Johnson's case of the additional evidence that the two young boys in Brown's care had been murdered in the apartment. In Void's trial, the judge ruled that such evidence was more prejudicial than probative. The judge observed, moreover, that the non-murder evidence admissible from the Maryland apartment against Void was even stronger, *i.e.,* more probative, against Johnson because of Johnson's direct link to the apartment through the stolen 9mm. gun the police had found on him. *Id.* at 381–82 n. 15. This observation accordingly made clear that any additional evidence from the Maryland scene explicitly confirming one or more "murders" would have been even less necessary to the government's case against Johnson than against Void. Put another way, given the admissibility of the powerful burglary, guns, and shell casings evidence from the apartment, any probative value from adding the explicit "murder" evidence in Maryland, in order to prove the identity of Carrington's killer, was marginal—especially in the Johnson case—when compared to the highly inflammatory, prejudicial impact of evidence that two small boys had been murdered in the apartment. *See Willcher v. United States,* 408 A.2d 67, 76 n. 9 (D.C.1979) (availability of other means of proof, and government's need for evidence may affect probative value); *Campbell,* 450 A.2d at 431 (low probative value where government's need for evidence was also low).

Although it has "no difficulty," *ante* at 1093, concluding that the Maryland murder evidence was offered for a proper purpose, the en banc majority apparently finds it much harder to explain why it was not an abuse of discretion for the trial court to conclude that the prejudicial impact of the Maryland murder evidence did not substantially outweigh the probative value. The majority works hard to bolster the probative value and minimize the prejudice of the Maryland murder evidence by explaining what the defense could have argued and how the jury likely interpreted the evidence. *See ante* at 1094–1096. Judge Belson stresses that, in addition to the burglary evidence, "the use of the .45 at both places [Carrington's murder scene and the Maryland apartment] showed almost incontrovertibly that the two events were connected." *Ante* at 1094. How true! And how easily that connection could have been satisfied entirely, as in *Void,* by testimony that .45 caliber bullets and shell casings, linked by expert testimony to the gun that killed Carrington, had been found in the Maryland apartment.[18] The majority never satisfactorily explains why the jury had to learn in addition that the bullets were found in the skulls of two small boys. The best the majority can do is to say that the murders would help the jury infer that if the burglars took time to kill the children, the children must have known them, so the killers must have been persons who frequented the apartment—including Johnson.

This, to say the least, is a very strained basis for admitting inflammatory child-murder evidence. In the first place, the testimony at trial suggested that the boys were killed in their sleep; there was no evidence supporting the idea that the boys ever saw the burglars. Furthermore, even if the boys did see the burglars, or the burglars feared the boys would wake up and see them, it is

---

18. The majority apparently would require defense counsel not only to object to admission of other crimes evidence but also, as a fallback, to suggest how it should be sanitized for admission—some pieces in, other pieces out—if the court denies the motion to exclude it altogether. *See ante* at 1094 n. 6. I cannot agree; a blanket objection to admission of various related items of other crimes evidence should be sufficient to preserve a claim of error with respect to any piece of it. *Cf. Hill v. United States,* 600 A.2d 58, 64 (D.C.1991) (FERREN, J., dissenting) (unqualified objection to other crimes evidence constitutes objection to each witness and detail presented). After such objection, the trial court should independently weigh the probative value and prejudicial impact of each piece of evidence. In this case, therefore, when considering whether the trial court abused its discretion in weighing the probative value against the prejudicial impact of the other crimes evidence, this court should not lump together the variety of related other crimes evidence (*e.g.,* entering the Maryland apartment, stealing the 9mm. pistol, discharging .45 caliber bullets, leaving shell casings, and murdering the children) into a single analytical "other crimes" category. *See ante* at 1094.

just as likely that the burglars killed the boys because the boys would be able to provide the police with physical descriptions, whether they knew the burglars or not. In short, the probative value of this murder evidence for the purpose the majority proffers it is speculative at best, indeed a makeweight as I see it.

### III.

There can be no question—as Void's conviction itself demonstrates—that the government's case did not depend in any way on the jury's learning that the expended .45 caliber bullets from the gun that killed Carrington, found in the Maryland apartment where Johnson was shown to have been present, were found in the bodies of two sleeping boys. Moreover, of considerable independent significance, the jury did not merely learn of this bare fact; the jury learned about it over and over and over and over and over and over and over again, in gruesome detail, as though Johnson also was on trial for the murders of two young boys in Maryland. Even if I did not believe the initial admission of the Maryland murders evidence was erroneous, I would order reversal of Johnson's convictions because of the excessive, inflammatory, and thus entirely inappropriate use of the Maryland murder evidence throughout the trial. *See Jones v. United States,* 625 A.2d 281, 288 (D.C.1993) (abuse of discretion to allow presentation of excessive evidence pertaining to homosexual relationship); *Hill,* 600 A.2d at 63 (redundant and excessive use of other crimes evidence can be separate grounds for reversal).

I cannot accept the majority's insistence that the government did not focus unduly on the Maryland murders. *See ante* at 1101–1103. I am satisfied that the prosecutor's repeated, graphic references to the boys' murders must have diverted the jurors' attention from the only murder case they were charged with deciding: Tyrone Carrington's. The prejudice from this three-murder trial to achieve a one-murder conviction was palpable, as Judge Sullivan ably demonstrated in Part V of his now-vacated opinion for the division, which I set forth as an Appendix.

The majority faults defense counsel for making the situation worse (1) by failing to object to the way the prosecutor used the Maryland murder evidence in examining witnesses and (2) by cross-examining witnesses about that evidence. This argument overlooks, once again, that defense counsel had objected to all such evidence; that once the Maryland murders were in evidence, counsel had to do with that evidence what seemed best suited to the case at the time; and that the trial court had the ultimate, continuing responsibility, once alerted to the problem, to keep overly prejudicial other crimes evidence out of the case. *See Jones,* 625 A.2d at 287; *cf. Hordge v. United States,* 545 A.2d 1249, 1257 (D.C.1988) ("trial court has a continuing obligation to grant a severance if undue prejudice arises as a result of joinder at any time during trial"); *Sousa v. United States,* 400 A.2d 1036, 1040 (D.C.1979), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979) (same).

\* \* \*

Judge Eilperin had it right in the *Void* case. The judge, and this court, have it wrong in this case, where the Maryland apartment evidence against Johnson—without the murder evidence—was stronger even than it was against Void. I see the majority in this case moving as a juggernaut not only sustaining erroneously admitted "other murders" evidence against Johnson but also wiping away, without the government's even asking for it, a time-honored, balanced approach to admitting other crimes evidence only when the government can show it is demonstrably more probative than prejudicial. The majority now, in effect, has lowered the threshold of admissibility, which will be increasingly harder for the accused to defend, especially because probative value now must be "substantially" outweighed by prejudicial impact. I fear this is a subtle, but powerful, invitation for prosecutors to demonstrate the defendant's guilt, at least in part, on the basis of criminal propensity evidence—a proposition that this court has heretofore held to be inconsistent with the presumption of innocence. *See Thompson,*

546 A.2d at 419. Again, respectfully—but emphatically—I dissent.[19]

## APPENDIX

(From Judge Sullivan's opinion
for the division)

### V.

At trial, the prejudicial effect of the evidence was further compounded by the amount of evidence presented on the two boys' murders. Evidence of the shootings permeated the trial from the government's opening statement to closing arguments. In the prosecutor's opening statement, he revealed that a bullet exited one boy's ear and that one boy was shot once and the other boy twice. He also stated during opening statement that when Crystal Brown returned to her apartment, she heard a moaning sound, thereafter discovering that her boyfriend's son and her younger brother had been shot. This court has recognized the danger of references to other crimes evidence during opening statements. *Day v. United States*, 360 A.2d 483, 485 (D.C.1976) ("Evidence which comes within the *Drew* exceptions should not be mentioned in opening statement, nor should it be ruled admissible without a proffer of proof from the government out of the hearing of the jury."). While the present case is distinguishable in that here there was a pretrial ruling allowing the evidence, the danger remains that references to other crimes during opening statements "irretrievably puts before a jury the fact that a defendant has been involved in [other] criminal activity." *United States v. Bailey*, 164 U.S.App. D.C. 310, 505 F.2d 417, 420 (1974), *cert. denied*, 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

Further, during the prosecutor's opening statement and early in the government's case-in-chief, a stream of references to the two boys' murders focused the jury on the issue of whether appellant was a child killer as well as being a drug dealer and an alleged triggerman in the death of Tyrone Carrington. After opening statements, the government called Crystal Brown as its first witness, the woman who in one tragic evening, lost her boyfriend, her boyfriend's son, and her younger brother. Though she testified at length about the drug operation in which she, Carrington, Void, and appellant were involved, she also testified about specific aspects of the boys' murders and the break-in at her apartment. She discussed how, on the night of the murders, she had given the boys explicit instructions not to open the door for anyone and how she had tested them on this instruction in the past by appearing to leave and then returning to the door. She described the horrible scene she discovered upon returning to her apartment, finding Carrington's son Carlos and her brother Calvin both shot in the head, with a gun lying on the floor in front of them. She testified that she did not try to hide the bag of cocaine in her dresser because her "first priority was to get some help for the kids." She also stated that neither appellant nor Bruce Void attended the funerals or the wakes of the two boys, even though both men knew the boys and had played with them in the past. The government *concluded* its direct examination of Crystal Brown as follows:

Q. Ms. Brown, what happened to Carlos Carrington?

A. He was already dead when I got there.

---

**19.** I also respectfully dissent from the majority's alternative, non-*Drew* holding in Part II. C., *ante* at 1096–1098, although, as I understand it, this part of the opinion does not purport to alter the law of this jurisdiction. Fundamentally, that discussion addresses what is commonly known as *Toliver* evidence, summarized in *Toliver v. United States*, 468 A.2d 958, 960–61 (D.C.1983) (approving admissibility of evidence that is "inextricably intertwined" with the crime, "intimately entangled," "relevant to explain the immediate circumstances," "admissible '[t]o complete the story of the crime on trial by proving its immediate context.'"). I do not believe the government has

established sufficient temporal, geographical, and logical links to deem the Maryland murders connected with Carrington's murder within the meaning of *Toliver*. Furthermore, even if the *Toliver* link was established, probative value did not outweigh prejudicial impact. *See Green v. United States*, 440 A.2d 1005, 1007 (D.C.1982) (*Toliver* evidence admissible "when its probative impact outweighs its prejudicial value"). I also note, and respectfully dissent from, the majority's relaxation of the probative value/prejudicial impact test for *Toliver* evidence by importing FED. R.EVID. 403 into that analysis as well. *See ante* at 1101.

 

Q. And what happened to your brother, Calvin Moore, III?

A. He was pronounced dead about two days later.

MR. FRIEDMAN: I have no further questions.

THE COURT: All right. [L]et me give the jury a five-minute recess before we start the cross examination.

References to the boys' murders continued throughout the trial. The Prince George's County detective who responded to the scene of the boys' murders testified on direct examination by the prosecutor as follows:

Q. Now, were any—Were there any bodies there when you got there?

A. There was one.

Q. And who was that, if you know?

A. Carlos Carrington.

Q. How old is he?

A. I believe Carlos is 13 years old.

Q. Where was he?

A. Laying on a bedroom floor wrapped in a blanket pulled over his head.

Q. And was he dead or alive?

A. He was dead.

Q. Was the other boy dead when you arrived?

A. No. When I had arrived he had already been transported to the hospital. He was still alive at the time he was first found.

Later in the trial, another detective who was present during Carlos Carrington's autopsy testified regarding the bullet recovered from the skull of Carlos Carrington and how the bullet was marked with the victim's initials for identification purposes. Following that detective's testimony, the government called the evidence technician who retrieved the shell casings from the scene of the boys' murders:

Q. The one that was lying there, can you just briefly describe for the jury what you saw?

A. The young black male was lying there with a pillow that appeared to be folded over the top of his head and also had a blanket that was covering the rest of his body.

Q. Was there any sign of shots fired?

A. It appeared to be two bullet holes in the top of the pillow that was covering the left side of his face and there's also some evidence of blood coming out of the pillow itself.

\* \* \* \* \* \*

Q. Did you find any sign of shots fired, any bullets there?

A. Yes, I did. I located three .45 caliber shell casings. Two of them were very close to the bloody area, blood spots, and one was just a short distance away towards the closet area, as I indicated with this line here (pointing).

Q. And did you find any slugs, any bullets?

A. Yes, I did. When we removed the pillow from the young man's face and attempted to move him, we observed a large caliber bullet that was alongside his right ear in between the pillow and his face. And the second large caliber bullet was under the bloody—spots of blood areas, actually down underneath the carpet. I had to cut the carpet out, a square, and pull the carpet back and the bullet was lodged in the wooden floor.

The government also elicited testimony during its case-in-chief to the effect that one child could have awakened only to have been shot in the head immediately thereafter. In the government's closing argument, the prosecutor stated:

Then you can conclude that one of the boys woke up, and the two boys were executed. They would have recognized William and Bruce, wouldn't they? Yes. Yes. The same .45 that shot the second bullet into Tyrone Carrington put three bullets into the boys. That's the point of all that evidence about the three shell casings there lying around the boys, one bullet out of one boy's ear, one bullet out of one boy. The one who had the one in his ear, another bullet dug out of him in the autopsy in Maryland.

The government's pervasive references to the boys' deaths placed the forbidden issue of

the appellant's criminal disposition squarely before the jurors, often through a graphic or otherwise unsettling testimony. Although the prosecutor's use of the evidence was permissible in light of the motion judge's ruling, the amount of evidence relating to the boys' murders "was far more than necessary" to establish appellant's identity as one of Tyrone Carrington's killers. *See Jones v. United States,* 625 A.2d 281, 288 (D.C.1993); *Hill. v. United States,* 600 A.2d 58, 63 (D.C.1991). We recognize that the prosecutor is not required to "sanitize the government's evidence or make it appear less wrenching than it is," *Dixon, supra,* 565 A.2d at 77, however, the evidentiary excess present in appellant's case is a clear example of the type of prosecutorial overkill that we warned about in *Jones, supra,* 625 A.2d at 288. The cumulative effect of the evidence reinforced the prejudice to appellant by exaggerating the relevance of the two boys' slayings to the crimes for which appellant was on trial. The prosecutor's protracted use of the evidence created a trial within a trial: each reference to the children's murders increased the likelihood that the jury would infer guilt of the crimes for which appellant was charged based upon the senseless murders of the two boys. Consequently, the evidentiary excess here virtually insured improper use of the evidence by the jury, despite limiting instructions to do otherwise.

Though jurors are presumed to follow the instructions administered to them, the admission of other crimes evidence is always problematic because "it is difficult, if not at times practically impossible, to avoid its use as predisposition evidence." *Groves, supra,* 564 A.2d at 374. The improper inference of criminal propensity was present throughout the entire trial, and the impermissible prejudice to appellant in admitting evidence of the boys' murders was far beyond the curative scope of limiting instructions. "Cautionary instructions, such as the one[s] given in this case, are designed primarily to blunt permissible prejudice.... They cannot cure impermissible prejudice." *Williams v. United States,* 382 A.2d 1, 7 (D.C.1978). Because the evidence should have never been allowed

by the motions judge, we are not confronted with the issue of whether the limiting instructions given by the trial court effectively mitigated any "permissible" prejudice from properly admitted evidence. "In the face of seriously prejudicial evidence, curative instructions, particularly those buried within the charge-in-chief at the end of the trial, are of minimal worth." *Id.* In the present case, it is precisely because the prejudicial effect of the evidence could not be minimized by limiting instructions that the evidence of the boys' murders should have never reached the jury. As this court has noted, "one cannot unring a bell," nor can "a drop of ink be removed from a glass of milk." *Thompson, supra,* 546 A.2d at 425. Once the evidence of the boys' murders was improperly admitted, the fundamental error was made and the trial irreversibly tainted. The manner in which the evidence was used by the government only magnified the error in admitting the evidence.